**In the Matter of F. O. BAROFF COMPANY, INC., Debtor.**

**AMERICAN BANK & TRUST COMPANY, Plaintiff-Appellant,**

v.

**Edward S. DAVIS, Trustee, Defendant-Appellee.**

No. 122, Docket 76–5020.

United States Court of Appeals, Second Circuit.

Argued Oct. 20, 1976.

Decided May 12, 1977.

Vincent Syracuse, New York City (Kaye, Scholer, Fierman, Hays & Handler, Reavis & McGrath and David C. Birdoff, New York City, on the brief), for plaintiff-appellant.

Philip H. Curtis, New York City (Hughes, Hubbard & Reed, L. Homer Surbeck and James W. Giddens, New York City, on the brief), for defendant-appellee.

Before FRIENDLY, HAYS and MULLIGAN, Circuit Judges.

HAYS, Circuit Judge:

On this appeal is presented the novel but narrow question whether under the New York law of insurance, the estate of a bankrupt insured which has sustained loss otherwise within the scope of its policy of indemnity has a right to the proceeds of the policy which is superior to the right of a third person with an unsatisfied claim against the insured within the scope of the insurance agreement. We hold that New York Insurance Law § 167(1) requires that the relative rights of the insured and such a third person to the policy's proceeds depend on their relative contribution to the loss sustained by the person injured in the first instance by the event insured against.[1]

---

1. "§ 167. Liability insurance; standard provisions; right of injured person

1. No policy or contract insuring against liability for injury to person, except as stated in subsection three, or against liability for injury to, or destruction of, property shall be issued or delivered in this state, unless it contains in substance the following provisions or provisions which are equally or more favorable to the insured and to judgment creditors so far as such provisions relate to judgment creditors:

F. O. Baroff Co., the debtor, formerly a broker-dealer in the securities industry, entered into a contract with the appellant American Bank & Trust Co., itself now defunct,[2] pursuant to which the Bank was to provide loans to Baroff and to "clear" securities traded by Baroff. As part of the arrangement, Baroff pledged negotiable securities as collateral for its obligations to the Bank.

In July, 1970, Baroff obtained from the Insurance Company of North America a policy of indemnity called a "Broker's Blanket Bond." Pursuant to the policy, Baroff was to be indemnified against losses which it sustained resulting from, *inter alia,* theft or fraud by its employees or the sale by it of forged securities. In April, 1971, precisely such untoward events occurred. As part of a fraudulent scheme in which Baroff employees participated and for which they were convicted, stolen securities belonging to Mrs. Esther Corey and bearing her forged indorsements were received by Baroff. Baroff, in turn, indorsed the securities and transmitted them to the Bank for clearance. As part of its agreement to clear securities sold by Baroff, the Bank indorsed the securities and guaranteed prior indorsements.

As a result of the receipt, sale and indorsement of the stolen securities, the Bank as well as Baroff became liable to Mrs. Corey. In December of 1971, before being placed in liquidation, Baroff directly paid Corey accrued dividends on the stolen securities, in the amount of $5,128.54. In addition, Baroff paid $9,240.87 to Loeb Rhoades

& Co. to arrange redelivery of securities to Mrs. Corey.

In January of 1972, Baroff was placed in liquidation pursuant to the Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78aaa *et seq.,* a status tantamount to bankruptcy. *See id.* § 78fff(c)(1); *In re Weis Securities, Inc.,* 542 F.2d 840 (2d Cir. 1976). After Baroff had been placed in liquidation, Mrs. Corey compromised her claim against the Bank by a settlement of $180,449.58.

The Bank, of course, by virtue of its payments to Mrs. Corey, became subrogated to her claims against Baroff.[3] The latter, however, was already in liquidation; thus the Bank could not simply sue Baroff, obtain a judgment, and procure its execution. Instead, the Bank obtained from Baroff's Trustee the release of the escrowed proceeds of the securities which Baroff had pledged as collateral to the Bank. Thereby, the Bank realized $79,321.62.

Since Baroff's unsatisfied liability to the Bank remained in excess of $100,000, the Bank sought from the Trustee the entire proceeds of the Broker's Blanket Bond, $100,000, which had been paid to the Trustee by the Insurance Company of North America. The Trustee refused to pay the Bank the full $100,000. Rather, the Trustee concluded that, under section 167(1) of the New York Insurance Law, the bankrupt's estate was entitled to retain $93,-691.03 (the sum of the $5,128.54 paid directly to Mrs. Corey, the $9,240.87 paid to Loeb Rhoades to arrange redelivery of securities

---

(a) A provision that the insolvency or bankruptcy of the person insured, or the insolvency of his estate, shall not release the insurer from the payment of damages for injury sustained or loss occasioned during the life of and within the coverage of such policy or contract.

(b) A provision that in case judgment against the insured or his personal representative in an action brought to recover damages for injury sustained or loss or damage occasioned during the life of the policy or contract, shall remain unsatisfied at the expiration of thirty days from the serving of notice of entry of judgment upon the attorney for the insured, or upon the insured, and upon the insurer, then an action may, except during a stay or limited stay of execution against the insured on such judg-

ment, be maintained against the insurer under the terms of the policy or contract for the amount of such judgment not exceeding the amount of the applicable limit of coverage under such policy or contract.
. . ."

2. During the pendency of this appeal, appellant American Bank & Trust Co. was placed in liquidation and the Federal Deposit Insurance Corporation, as receiver, assumed the prosecution of the action.

3. None of the parties disputes that Baroff was liable to the Bank on account of the transfer of stolen securities.

to Mrs. Corey, and the $79,321.62 proceeds of the securities which were collateral for Baroff's obligations to the Bank), which the Trustee considered to be the loss to Baroff resulting from its receipt of the stolen securities. The Trustee, however, relinquished to the Bank $6,308.97, the balance of the $100,000 proceeds of the Broker's Blanket Bond. The bankruptcy court and the district court sustained the Trustee's refusal to allow the Bank any greater share of the $100,000 proceeds.

Section 167(1)(a) of the New York Insurance Law provides that each policy insuring against liability must include:

"A provision that the insolvency or bankruptcy of the person insured, or the insolvency of his estate, shall not release the insurer from the payment of damages for injury sustained or loss occasioned during the life of and within the coverage of such policy or contract." [4]

The Trustee contends that Baroff, despite its bankruptcy and the terms of section 167(1)(a), was entitled to recover its losses of $93,691.03. The Trustee reasons that section 167(1) was enacted by the Legislature in response to a specific evil. Prior to enactment of the predecessor to section 167(1), Consol.L., c. 33 § 109 (1909), *added by* Sess.L., c. 524 (1917), courts held that in the event of his bankruptcy, the insured, although liable to a third person, suffered no loss since he was unable to pay the one he had injured. Because the insured had not sustained a loss, the insurance company had no liability to the insured. *See Harris v. Standard Accident & Ins. Co.,* 297 F.2d 627 (2d Cir. 1961), *cert. denied,* 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847 (1962) (insurer had no obligation to insured who, because of bankruptcy, suffered no loss). Although the insured had done injury to a third person within the scope of the policy, the third person, lacking privity of contract with the

insurer, was left to suffer his injuries without recourse against the insurance company, which in a sense thereby realized a windfall. In enacting what is now section 167(1) the Legislature sought to remedy this evil. *See Merchants Mutual Automobile Liability Ins. Co. v. Smart,* 267 U.S. 126, 130, 45 S.Ct. 320, 69 L.Ed. 538 (1925); *Coleman v. New Amsterdam Casualty Co.,* 247 N.Y. 271, 275, 160 N.E. 367, 369, 72 A.L.R. 1443, 1445–46 (1928); *cf. Roth v. National Automobile Mutual Casualty Co.,* 202 App. Div. 667, 669, 195 N.Y.S. 865, 867 (1st Dept. 1922). The Trustee argues that section 167(1) was not intended to affect Baroff's right to the $93,691.03, since Baroff sustained losses in that amount within the scope of the Broker's Blanket Bond and thus the insurer would have been obliged to pay that amount despite Baroff's bankruptcy. In other words, since in the instant case the "bankruptcy of the person insured" would not even apart from the operation of section 167 have "release[d] the insurer from the payment of damages for injury sustained or loss occasioned . . ." of $93,691.03, section 167 need be called into action only to render the insurance company liable for the $6,308.97 balance of the $100,000 face value of the Broker's Blanket Bond.

We conclude, however, that the New York Legislature did not intend the effect of section 167 to be so narrowly circumscribed by the goal of avoiding insurer's "windfalls." *Merchants Mutual Automobile Liability Insurance Co. v. Smart* and *Coleman v. New Amsterdam Casualty Co., supra,* indeed offer some support for the Trustee's argument that section 167 was designed by the Legislature to avoid "windfalls" to insurance companies resulting from bankruptcy or insolvency of their insureds. But, in the great majority of cases, to say that the insurance company has re-

---

4. The Broker's Blanket Bond which Baroff purchased from the Insurance Company of North America did not contain the terms mandated by section 167(1). Under New York Insurance Law § 143, the New York courts would not on this ground declare the insurance policy invalid, but they would read it as if it contained the required provisions. *See, e. g., Lauritano v. American Fidelity Fire Ins. Co.,* 3 A.D.2d 564, 568, 162 N.Y.S.2d 553, 556–57 (1st Dept. 1957), *aff'd mem.,* 4 N.Y.2d 1028, 177 N.Y.S.2d 530, 152 N.E.2d 546 (1958); *Skenandoa Rayon Corp. v. Halifax Fire Ins. Co.,* 245 App.Div. 279, 281 N.Y.S. 193 (4th Dept. 1935).

ceived a "windfall" is as much as to say that a third person wronged by the insured and otherwise entitled to the proceeds of insurance has been deprived of the benefits of the insurance on account of his malefactor's bankruptcy or insolvency. *See Harris v. Standard Accident & Ins. Co., supra,* 297 F.2d at 631 (section 167 prompted by philosophy that "having received the premiums the insurance company should not avoid liability *to a person injured* . . . merely because the insured was unable to pay" [emphasis supplied]). Here, Baroff wronged Mrs. Corey. The Bank became subrogated to her rights. Baroff's wrong was within the scope of the Broker's Blanket Bond. Had it not been for the bankruptcy, the Bank would have recovered from Baroff the entire amount of the settlement with Mrs. Corey. Section 167, we hold, was intended by the Legislature to mitigate the effects of an insured person's bankruptcy on those to whom the insured has liability within the scope of the policy, by creating in effect a trust fund of the insurance proceeds for the benefit of the injured person. Therefore, as Mrs. Corey's subrogee, the Bank acquired rights in the policy superior to Baroff's own rights, except of course to the extent that Baroff also made payments to Mrs. Corey.

Although none of the cases construing section 167 or its predecessor statutes have considered the precise issue which we face here, their description of the intended effect of section 167 supports our reading of the statute. In *Merchants Liability Co. v. Smart, supra,* the Supreme Court, considering whether the predecessor of section 167 was an unlawful preference contrary to the National Bankruptcy Act, held that the statute

"secures to the injured person the indemnity which his injurer has provided for himself in advance to avoid payment for the injury. But the clause becomes operative only in the event of the insolvency or bankruptcy of the insured when he can no longer use the indemnity to pay the injured person as he should. The title to the indemnity passes out of the bankrupt or insolvent person and vests in him in whom the contract and the state law declares it should vest."

267 U.S. at 131, 45 S.Ct. at 321. In the instant case, since Baroff's bankruptcy prevented it from using the insurance proceeds "to pay the injured person as [it] should", the Bank, as Mrs. Corey's subrogee, acquired a superior right to the insurance funds. As Chief Judge Cardozo wrote in *Coleman,*

"The effect of the statute is to give to the injured claimant a cause of action against an insurer for the same relief that would be due to a *solvent principal* seeking indemnity and reimbursement *after the judgment had been satisfied.* The cause of action is no less but also it is no greater."

247 N.Y. at 275, 160 N.E. at 369, 72 A.L.R. at 1446 (emphasis supplied). Both *Smart* and *Coleman* leave scant doubt that, in enacting section 167, the Legislature intended that injured persons, rather than the trade creditors of the bankrupt, should reap the benefit of insurance policies indemnifying against liability. *See Brustein v. New Amsterdam Casualty Co.,* 255 N.Y. 137, 141, 174 N.E. 304, 305 (1931); *Skenandoa Rayon Corp. v. Halifax Fire Ins. Co.,* 245 App.Div. 279, 284, 281 N.Y.S. 193, 199 (4th Dept. 1935).[5]

We see in the statutory scheme further support for our view that section 167(1) was

---

5. *See also Lauritano v. American Fidelity Fire Ins. Co.,* 3 App.Div.2d 564, 567–68, 162 N.Y.S.2d 553, 556 (1st Dept. 1957), *aff'd mem.,* 4 N.Y.2d 1028, 177 N.Y.S.2d 530, 152 N.E.2d 546 (1958), where the late Justice Botein wrote for the Court:

"[T]he legislature, recognizing that an injured party, while not privy to the insurance contract, had a genuine interest in it and should be enabled to invoke its protection,

enacted § 109 of the Insurance Law, forerunner of the present § 167, to create, as its heading indicates, an independent right of the injured person to proceed directly against the liability insurer (L.1917, ch. 524). Successive amendments have profoundly altered what was once commonly accepted—that the liability policy existed solely for the protection of the insured."

intended to accomplish more than the avoidance of "windfalls" to insurance companies. Section 167(1)(b) gives concrete expression to the principle, formulated generally by section 167(1)(a), that the bankruptcy of its insured does not release the insurer from payment of the loss. Section 167(1)(b) provides that, in the event that the injured claimant has procured a judgment against a bankrupt insured, he may, upon prescribed notice, proceed directly against the insurer:

"[I]n case judgment against the insured . . . shall remain unsatisfied at the expiration of thirty days from the serving of notice of entry of judgment upon the attorney for the insured, or upon the insured, and upon the insurer, then an action may, except during a stay or limited stay of execution against the insured on such judgment, be maintained against the insurer under the terms of the policy or contract for the amount of such judgment not exceeding the amount of the applicable limit of coverage under such policy or contract."

By giving the injured person a direct action against the insurer, section 167(1)(b) clearly demonstrates that the fundamental policy underlying the statute is that injured claimants be protected against their injurers' bankruptcies; had the Legislature's concern been focused solely on the avoidance of windfalls by insurance companies, it could have provided merely that the proceeds of the insurance policy accrue to the bankrupt's estate. Moreover, section 167(1)(b) contains no suggestion that the Legislature intended the injured person's right of direct recovery from the insurance company to

depend on whether the insured had also suffered loss in the transactions in question. Therefore, section 167(1)(b) leaves no doubt that, had the Bank been able to secure a judgment against Baroff prior to the latter's being placed in liquidation, the Bank would have had rights in the insurance proceeds notwithstanding the insured's loss within the scope of the policy. *Cf. Coleman v. New Amsterdam Casualty Co., supra,* 247 N.Y. at 275, 160 N.E. at 369, 72 A.L.R. at 1446.

■ Section 167(1)(b) does not by its terms apply here since the intervening bankruptcy of Baroff prevented the Bank from prosecuting its claim to judgment. *See* Bankruptcy Act § 11 a, 11 U.S.C. § 29 a. However, in formulating the mechanism whereby an injured person could receive the benefit of his insurer's insurance "in case judgment against the insured . . . shall remain unsatisfied", section 167(1)(b) simply reflected the general principles which the Legislature had in mind when it adopted section 167(1)(a). The legislative history of section 167(1) makes clear that it was not intended to establish any difference in the substantive rights of one who has procured a judgment against his injurer before bankruptcy and one who has not.[6] To hold otherwise would force an injured claimant to rush to obtain judgment against an insured for whom bankruptcy is a prospect; such a course, for obvious reasons, would promote both litigation and bankruptcies, something we believe the Legislature did not intend in enacting section 167.[7] Although the Bank was prevent-

---

**6.** Section 109 of the Consolidated Laws of 1909, *added by* Sess.L., c. 524 (1917), the predecessor of section 167(1), provided that each liability policy must contain:

"a provision that the insolvency or bankruptcy of the person insured shall not release the insurance carrier from the payment of damages for injury sustained or loss occasioned during the life of such policy, and stating that in case of such insolvency or bankruptcy, an action may be maintained by the injured person against such [insurance] corporation under the terms of the policy for an amount not exceeding the amount of the policy."

Therefore, old section 109 was intended to provide that an injured person could proceed di-

rectly against the insolvent wrongdoer's insurer. The substantive rights created were the same, irrespective of whether or not the injured person had obtained a judgment against the insured. Subsequent re-enactments and codifications of that section do not reveal an intent to restrict the substantive rights originally conferred. Quite the opposite has been true. *See* note 5 *supra;* note 7 *infra.*

**7.** In reaching our decision, we are mindful that section 167 applies to all insurance policies which indemnify against liability, including automobile insurance which is mandatory by statute. *See New York Vehicle and Traffic Law* §§ 310–371. As originally enacted, Con-

ed from obtaining a judgment against Baroff, section 167(1) gave the Bank as Mrs. Corey's subrogee the right to satisfy its claim against Baroff out of the proceeds of the Broker's Blanket Bond, subject to the limitations only that it could not recover from the insurer more than the face value of the policy, and that rights acquired by Baroff by virtue of its own payments to Mrs. Corey would be taken into account.

■ Finally, Baroff's Trustee contends that section 167(1) does not apply here, since the insurance policy in question was a Broker's Blanket Bond rather than a simple liability policy. In our view, the contention has no merit. Section 167(1) applies to all insurance policies indemnifying against liability. Since the losses which are the basis for the Trustee's claim of entitlement to the insurance proceeds derive from Baroff's liability to Mrs. Corey and the Bank, and since the Bank's claim to the insurance proceeds is based upon Baroff's liability to the Bank, it has no bearing on the instant case that the Broker's Blanket Bond might have secured to Baroff an indemnity against other loss. Indeed, the Trustee's contention misses the thrust of section 167(1), which is to transform the contract of insurance from one indemnifying the insured against loss to

him resulting from liability to a third person, into an arrangement whereby insurance proceeds are made directly available to the third person irrespective of the insured's own loss. *Harris v. Standard Accident & Ins. Co., supra*, 297 F.2d at 631; *see* note 5 *supra*.

■ Section 167 was designed by the New York Legislature to ensure that injured persons with unsatisfied claims against a bankrupt receive the proceeds of insurance before they enrich the bankrupt's general creditors. In the instant case, Mrs. Corey was the person injured in the first instance by Baroff, and the Bank succeeded to her rights. However, we think it fair, and not inconsistent with section 167, that the Bank's rights, as Mrs. Corey's subrogee, be qualified to the extent that Baroff also made payments to Mrs. Corey, the person it injured. Accordingly, we reverse the judgment of the district court and direct that the Bank is to share in the proceeds of the Broker's Blanket Bond in the ratio of its unpaid loss of $101,127.96 to the sum of the amounts paid by Baroff directly to Mrs. Corey and indirectly through Loeb Rhoades, to wit, $14,369.41.[8]

Reversed.

sol.L., c. 33, § 109 (1909), *added by* Sess.L., c. 524 (1917), the predecessor of section 167(1), applied only to motor and horse-drawn vehicles. Subsequently, the statute was broadened to govern, as it now does, all policies indemnifying against liability. Thus, the principles to be applied here are those which would be operative in an analogous dispute involving one who had sustained injuries within the scope of an automobile liability policy. If in such a case section 167 were not read to confer upon the injured claimant a right to insurance proceeds superior to that of the bankrupt's general creditors, the policies of the mandatory insurance statutes would be nullified, since the injured person would be deprived of the benefits which the injurer was required by law to make available to his victim to supplement the other assets of the injurer which would be available in the absence of insurance. It was the purpose of section 167 to provide in the automobile insurance case as well as the case at bar that the injured person would be enabled to satisfy his claim out of insurance proceeds before they passed into the estate of the bankrupt wrongdoer.

8. The Bank reimbursed Mrs. Corey in the amount of $180,449.58. In calculating the Bank's loss we deduct the $79,321.62 which the Bank realized from the securities pledged as collateral, that is, the amount it realized from a fund apart from the policy proceeds. Of course, the $79,321.62 should not be added to the amount which Baroff paid Mrs. Corey. The Bank has by subrogation become an injured person within the protection of section 167. As we have demonstrated, in determining rights to policy proceeds as between such an injured person and his injurer, payments by the insured to the injured person are not to be taken into account. The Bank's rights are qualified only by Baroff's rights by virtue of its payments to Mrs. Corey, *not* by Baroff's total losses. Baroff's loss of its collateral, pledged in anticipation of such a liability, is entirely different from the payments it made as a consequence of Mrs. Corey's claim; the collateral was part of a separate agreement between Baroff and the Bank for the Bank's benefit and should not reduce the Bank's share of the insurance proceeds.