10-2378-bk(L)
In re: Bernard L. Madoff Inv. Sec. LLC

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2010

(Argued: March 3, 2011      Decided: August 16, 2011)

Docket Nos. 10-2378-bk(L); 10-2676-bk(con); 10-2677-bk(con); 10-2679-bk(con); 10-2684-bk(con); 10-2685-bk(con); 10-2687-bk(con); 10-2691-bk(con); 10-2693-bk(con); 10-2694-bk(con); 10-2718-bk(con); 10-2737-bk(con); 10-3188-bk(con); 10-3579-bk(con); 10-3675-bk(con)

- - - - - - - - - - - - - - - - - - - - -x

IN RE: BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,
                                        Debtor.*
- - - - - - - - - - - - - - - - - - - - -x

        Before:        JACOBS, Chief Judge, LEVAL and RAGGI,
                       Circuit Judges.

        Former investors with Bernard L. Madoff appeal from an

order entered by the United States Bankruptcy Court for the

Southern District of New York (Lifland, J.) in the

liquidation proceedings of Bernard L. Madoff Investment

Securities LLC under the Securities Investor Protection Act.

The Trustee, Irving H. Picard, concluded that the investors'

"net equity," which determines how customer property will be

---

        * Consolidated docket number 10-2737-bk was dismissed
with prejudice by stipulation of the parties on December 10,
2010.  Fed. R. App. P. 42(b).

distributed in the wake of Madoff's fraud, should be calculated based on the Net Investment Method.  The bankruptcy court affirmed the decision of the Trustee and certified its decision for immediate appeal to this Court.  28 U.S.C. § 158(d)(2).  This Court accepted the direct appeal from the bankruptcy court, and for the following reasons, we hold that the Trustee's determination as to how to calculate "net equity" under the Securities Investor Protection Act is legally sound in light of the circumstances of this case and the relevant statutory language.  Accordingly, we affirm the order of the bankruptcy court.

HELEN DAVIS CHAITMAN, Becker & Poliakoff, LLP, New York, New York (Peter Schuyler, *on the brief*), for Appellants Diane and Roger Peskin, et al.

KAREN E. WAGNER, Davis Polk & Wardwell LLP, New York, New York (Brian S. Weinstein, Jonathan D. Martin, *on the brief*), for Appellants Sterling Equities Associates, Arthur Friedman, David Katz, Gregory Katz, Michael Katz, Saul Katz, L. Thomas Osterman, Marvin Tepper, Fred Wilpon, Jeff Wilpon, Richard Wilpon, Mets Limited Partnership.

BARRY R. LAX, Lax & Neville, New York, New York (Brian Neville, Brian Maddox, *on the brief*), for Appellants Mary Albanese, et al.

Seth C. Farber, Kelly A. Librera, Dewey & LeBoeuf LLP, New York, New York, _for Appellant_ Ellen G. Victor.

Stephen Fishbein, Richard F. Schwed, Shearman & Sterling LLP, New York, New York, _for Appellants_ Carl J. Shapiro, _et al._

Carole Neville, Sonnenschein Nath & Rosenthal LLP, New York, New York, _for Appellants_ Marsha Peshkin IRA, Michael and Meryl Mann, Barry Weisfeld.

Matthew Gluck, Jonathan M. Landers, Brad N. Friedman, Jennifer L. Young, Milberg LLP, New York, New York, Stephen A. Weiss, Christopher M. Van de Kieft, Parvin K. Aminolroaya, Seeger Weiss LLP, New York, New York, _for Appellants_ The Aspen Company, _et al._

David B. Bernfeld, Jeffrey L. Bernfeld, Bernfeld, DeMatteo & Bernfeld, LLP, New York, New York, _for Appellants_ Michael Schur and Edith A. Schur.

David Parker, Matthew J. Gold, Jason Otto, Kleinberg, Kaplan, Wolff & Cohen, P.C., New York, New York, _for Appellants_ Lawrence Elins, Malibu Trading and Investing, L.P.

Stanley Dale Cohen, New York, New York, _for Appellants_ Lee Mellis, Jean Pomerantz, Bonnie Savitt.

Jeffrey A. Mitchell, Gibbons, P.C., New York, New York, _for Appellant_ Donald G. Rynne.

Daniel M. Glosband, Goodwin Procter LLP, Boston, Massachusetts (Larkin M. Morton, Goodwin Procter LLP, New York, New York, _on the brief_) _for Appellants_ Jeffrey A. Berman, _et al._

3

Chryssa V. Valletta, Phillips Nizer LLP, New York, New York for Appellants Herbert Barbanel, Alice Barbanel.

Lawrence R. Velvel, *pro se*, Andover, Massachusetts, for Appellant Lawrence R. Velvel.

JOSEPHINE WANG, General Counsel, Securities Investor Protection Corporation, Washington, District of Columbia (Kevin H. Bell, Senior Associate General Counsel for Dispute Resolution, Christopher H. Larosa, Associate General Counsel, Lauren Attard, Staff Attorney, *on the brief*), for Appellee Securities Investor Protection Corporation.

DAVID J. SHEEHAN, Baker Hostetler LLP, New York, New York (Thomas D. Warren, Wendy J. Gibson, Seanna R. Brown, *on the brief*), for Appellee Irving H. Picard, as Trustee for the Substantively Consolidated Securities Investor Protection Act Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff.

MICHAEL A. CONLEY, Deputy Solicitor for Securities & Exchange Commission, Washington, District of Columbia (David M. Becker, General Counsel, Mark D. Cahn, Deputy General Counsel, Jacob H. Stillman, Solicitor, Katharine B. Gresham, Assistant General Counsel, *on the brief*), for Amicus Curiae Securities & Exchange Commission.

DENNIS JACOBS, Chief Judge:

In the aftermath of a colossal Ponzi scheme conducted by Bernard Madoff over a period of years, Irving H. Picard has been appointed, pursuant to the Securities Investor

Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), as Trustee for the liquidation of Bernard L. Madoff Investment Securities LLC, id. § 78eee(b)(3). Pursuant to SIPA, Mr. Picard has the general powers of a bankruptcy trustee, as well as additional duties, specified by the Act, related to recovering and distributing customer property. Id. § 78fff-1. Essentially, Mr. Picard has been charged with sorting out decades of fraud. The question presented by this appeal is whether the method Mr. Picard selected for carrying out his responsibilities under SIPA is legally sound under the language of the statute. We hold that it is. Accordingly, we affirm the order of the United States Bankruptcy Court for the Southern District of New York (Lifland, J.).

**BACKGROUND**

The facts surrounding Bernard Madoff's multibillion dollar Ponzi scheme are widely known and were recounted in detail by the bankruptcy court. In re Bernard L. Madoff Inv. Sec. LLC, 424 B.R. 122, 125-32 (Bankr. S.D.N.Y. 2010); see also, e.g., In re Beacon Assocs. Litig., 745 F. Supp. 2d 386, 393-94 (S.D.N.Y. 2010); Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 387, 389-90 (S.D.N.Y. 2010); In re Tremont Sec. Law, State Law & Ins. Litig., 703 F. Supp. 2d 363, 367-68 (S.D.N.Y. 2010). For our purposes, a few

facts suffice. When customers invested with Bernard L. Madoff Investment Securities LLC ("BLMIS"), they relinquished all investment authority to Madoff. Madoff collected funds from investors, claiming to invest those funds pursuant to what he styled as a "split-strike conversion strategy" for producing consistently high rates of return on investments.[2] J.A. Vol. II at 292. The split-strike conversion strategy supposedly involved buying a basket of stocks listed on the Standard & Poor's 100 Index and hedging through the use of options. However, Madoff never invested those customer funds. Instead, Madoff generated fictitious paper account statements and trading records in order to conceal the fact that he engaged in no trading activity whatsoever. Even though a customer's monthly account statement listed securities transactions purportedly executed during the reporting period and purported individual holdings in various Standard & Poor's 100 Index stocks as of the end of the reporting period, the

---

[2] A select group of Madoff's family members, close friends, and employees held "non-split strike" accounts. Madoff provided these customers with invented account statements that reflected even greater investor success than the unwavering returns purportedly earned for his split-strike customers. In re Bernard L. Madoff, 424 B.R. at 130-31. The non-split strike customers are not parties to this appeal.

statement did not reflect any actual trading or holdings of securities by Madoff on behalf of the customer. "In fact, the Trustee's investigation revealed many occurrences where purported trades were outside the exchange's price range for the trade date." In re Bernard L. Madoff, 424 B.R. at 130. Other now revealed irregularities make it clear that "Madoff never executed his split-strike investment and hedging strategies, and could not possibly have done so." Id. To point out just two examples, "an unrealistic number of option trades would have been necessary to implement the . . . [s]trategy" and "one of the money market funds in which customer resources were allegedly invested through BLMIS . . . has acknowledged that it did not even offer investment opportunities in any such money market fund from 2005 forward." Id.

As is true of all Ponzi schemes, see Cunningham v. Brown, 265 U.S. 1, 7 (1924) (describing the "remarkable criminal financial career of Charles Ponzi"), Madoff used the investments of new and existing customers to fund withdrawals of principal and supposed profit made by other customers. Madoff did not actually execute trades with investor funds, so these funds were never exposed to the uncertainties or fluctuations of the securities market.

7

Fictional customer statements were generated based on after-the-fact stock "trades" using already-published trading data to pick advantageous historical prices.  J.A. Vol. I at 365-66, 371, 512; J.A. Vol. II at 291, 293.  The customer statements documented an astonishing pattern of continuously profitable trades, approximating the profits Madoff had promised his customers, but reflected trades that had never occurred.  Although Madoff's scheme was engineered so that customers always appeared to earn positive annual returns, the dreamt-up rates of return Madoff assigned to different customers' accounts varied significantly and arbitrarily.  In re Bernard L. Madoff, 424 B.R. at 130.  Thus, the customer statements reflected unvarying investor success; but the only accurate entries reflected the customers' cash deposits and withdrawals.  J.A. Vol. I at 513.

Madoff's scheme collapsed when the flow of new investments could no longer support the payments required on earlier invested funds.  See Eberhard v. Marcu, 530 F.3d 122, 132 n.7 (2d Cir. 2008) (describing typical Ponzi scheme "where earlier investors are paid from the investments of more recent investors . . . until the scheme ceases to attract new investors and the pyramid collapses").  The final customer statements issued by BLMIS falsely recorded

8

nearly $64.8 billion of net investments and related fictitious gains. J.A. Vol. I at 505. It is not contended on this appeal that any victim knew or should have known that the investments and customer statements were fictitious. It is unquestioned that the great majority of investors relied on their customer statements for purposes of financial planning and tax reporting, to their terrible detriment.

When Madoff's fraud came to light, the Securities and Exchange Commission filed a civil complaint in the United States District Court for the Southern District of New York, alleging that Madoff and BLMIS were operating a Ponzi scheme.[3] The Securities Investor Protection Corporation ("SIPC"), a nonprofit corporation consisting of registered broker-dealers and members of national securities exchanges that supports a fund used to advance money to a SIPA trustee, then stepped in.[4] 15 U.S.C. § 78ccc; Sec. & Exch. Comm'n v. Packer, Wilbur & Co., 498 F.2d 978, 980 (2d Cir. 1974). SIPC filed an application in the civil action seeking a decree that the customers of BLMIS are in need of

---

[3] Madoff was arrested and charged with securities fraud; he pleaded guilty to an eleven-count criminal indictment and was sentenced to 150 years' imprisonment.

[4] By virtue of its registration with the SEC as a broker-dealer, BLMIS is a member of SIPC.

the protections afforded by SIPA. 15 U.S.C. § 78eee(a)(3)(A). The district court granted SIPC's application; the protective order appointed Mr. Picard as Trustee for the liquidation of the business of BLMIS and the SIPA liquidation proceeding was removed to the bankruptcy court. Id. § 78eee(b)(3)-(4); see also Sec. Investor Prot. Corp. v. BDO Seidman, LLP, 222 F.3d 63, 67 (2d Cir. 2000).

SIPA establishes procedures for liquidating failed broker-dealers and provides their customers with special protections. In a SIPA liquidation, a fund of "customer property," separate from the general estate of the failed broker-dealer, is established for priority distribution exclusively among customers. The customer property fund consists of cash and securities received or held by the broker-dealer on behalf of customers, except securities registered in the name of individual customers. 15 U.S.C. § 78lll(4). Each customer shares ratably in this fund of assets to the extent of the customer's "net equity." Id. § 78fff-2(c)(1)(B). Under SIPA:

> The term "net equity" means the dollar amount of the account or accounts of a customer, to be determined by--
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions

10

of such customer . . . ; minus

> (B) any indebtedness of such customer to the debtor on the filing date . . . .

Id. § 78lll(11).

In many liquidations, however, the assets in the customer property fund are insufficient to satisfy every customer's "net equity" claim. In such a case, SIPC advances money to the SIPA trustee to satisfy promptly each customer's valid "net equity" claim. For securities accounts, the maximum advance is $500,000 per customer. Id. § 78fff-3(a). For customers with claims for cash, the maximum advance is substantially less. Id. § 78fff-3(a)(1), (d). Under SIPA, all claims must be filed with the trustee, id. § 78fff-2(a)(2), who is charged with determining customer claims in writing. A customer's objection must be filed with the bankruptcy court.

In satisfying customer claims in this case, Mr. Picard, as the SIPA Trustee, determined that the claimants are customers with claims for securities within the meaning of SIPA. The Trustee further concluded that each customer's "net equity" should be calculated by the "Net Investment Method," crediting the amount of cash deposited by the customer into his or her BLMIS account, less any amounts withdrawn from it. J.A. at 274. The use of the Net

11

Investment Method limits the class of customers who have allowable claims against the customer property fund to those customers who deposited more cash into their investment accounts than they withdrew, because only those customers have positive "net equity" under that method. Some customers objected to the Trustee's method of calculating "net equity" and argued that they were entitled to recover the market value of the securities reflected on their last BLMIS customer statements (the "Last Statement Method"). After the filing of a number of objections, the Trustee moved the bankruptcy court for an order affirming his use of the Net Investment Method of calculating "net equity." Both SIPC and the SEC submitted briefs supporting the Trustee's motion.[5]

After a hearing, the bankruptcy court upheld the Trustee's use of the Net Investment Method on the ground that the last customer statements could not "be relied upon to determine [n]et [e]quity" because customers' account statements were "entirely fictitious" and did "not reflect

---

[5] The SEC further argued that the Net Investment Method should be applied using inflation-adjusted dollars. The Trustee argued that the issue whether the Net Investment Method should be adjusted to account for inflation or interest was beyond the scope of the briefing and took no position on it.

actual securities positions that could be liquidated . . . ." In re Bernard L. Madoff, 424 B.R. at 135. The bankruptcy court reasoned that the definition of "net equity" under SIPA "must be read in tandem with SIPA section 78fff-2(b), which requires the Trustee to discharge [n]et [e]quity claims only 'insofar as such obligations are [1] ascertainable from the books and records of the debtor or [2] are otherwise established to the satisfaction of the trustee.'" Id. (quoting 15 U.S.C. § 78fff-2(b)(2)). The bankruptcy court emphasized that the "BLMIS books and records expose a Ponzi scheme where no securities were ever ordered, paid for or acquired[,]" and concluded the Trustee could not "discharge claims upon the false premise that customers' securities positions are what the account statements purport them to be." Id. The Net Investment Method, unlike the Last Statement Method, allowed Mr. Picard to (in the bankruptcy court's phrase)"unwind[], rather than legitimiz[e], the fraudulent scheme." Id. at 136. The bankruptcy court reserved decision on the issue of whether the Net Investment Method should be adjusted to account for inflation or interest. Id. at 125 n.8. The bankruptcy court certified an immediate appeal to this Court, over which this Court accepted jurisdiction, pursuant to 28 U.S.C. § 158(d)(2)(A).

13

**DISCUSSION**

We review the legal conclusions of the bankruptcy court, including its interpretation of SIPA, <u>de novo</u>. <u>Turner v. Davis, Gillenwater & Lynch</u> (<u>In re Inv. Bankers, Inc.</u>), 4 F.3d 1556, 1560 (10th Cir. 1993). In conducting our independent review, we consider that the views of the Securities & Exchange Commission ("SEC") and SIPC are "entitled to respect, but only to the extent that [they have] the power to persuade." <u>Chao v. Russell P. Le Frois Builder, Inc.</u>, 291 F.3d 219, 228 (2d Cir. 2002) (internal quotation marks and alterations omitted); <u>see also</u> <u>In re New Times Sec. Servs., Inc.</u>, 371 F.3d 68, 76 (2d Cir. 2004) ("<u>New Times I</u>") (observing "that the drafters of SIPA clearly envisioned roles for both the SEC and SIPC in administering the statute").

The positions of the parties on appeal are as follows. Mr. Picard asserts that the objecting BLMIS claimants are customers with claims for securities under SIPA and that the plain language of SIPA dictates that their "net equity" be calculated based on the Net Investment Method. The SEC, as amicus curiae, supports the Trustee's view that, here, the Net Investment Method is required by the language of SIPA. The SIPC--deemed to be a party in interest as to all matters

14

arising in a SIPA proceeding--urges this Court to affirm the order of the bankruptcy court, which holds that on the present facts the Net Investment Method (and not the Last Statement Method) correctly measures "net equity."  The objecting BLMIS claimants contend that the Last Statement Method is mandated by the language of SIPA; that they had a legitimate expectation that their customer statements were accurate; that SIPA is designed to protect this legitimate expectation; and that the Net Investment Method undermines the purpose of the statute.

First, accepting that the objecting BLMIS claimants are "customers" under SIPA, they are customers with claims for securities.  Second, while the objecting BLMIS claimants and the Trustee argue the plain language of SIPA supports their (irreconcilable) positions, we conclude that the statutory language does not prescribe a single means of calculating "net equity" that applies in the myriad circumstances that may arise in a SIPA liquidation.[6]  See Sec. & Exch. Comm'n v. Aberdeen Sec. Co., 480 F.2d 1121, 1123 (3d Cir. 1973) ("The intent of Congress to protect customers of financially

_____

[6] The two competing methods of calculating "net equity" proposed by the parties to this litigation are the only two methods at issue here.  We do not hold that they are the only possible approaches to calculation of "net equity" under SIPA.

15

distressed security dealers is clear, but the specifics of precise resolution of individual situations are clouded by the provisions of a statute which range far from the clarity of blue sky one might expect in this area of the law."); McKenny v. McGraw (In re Bell & Beckwith), 104 B.R. 842, 848 (Bankr. N.D. Ohio 1989) (rejecting "plain meaning" arguments as to meaning of "allocation" under SIPA as "not persuasive"). Differing fact patterns will inevitably call for differing approaches to ascertaining the fairest method for approximating "net equity," as defined by SIPA. See 15 U.S.C. § 78fff-2(b)(2).

Mr. Picard's selection of the Net Investment Method was more consistent with the statutory definition of "net equity" than any other method advocated by the parties or perceived by this Court. There was therefore no error.[7] SIPA serves dual purposes: to protect investors, and to protect the securities market as a whole. See Sec. Inv. Prot. Corp. v. Barbour, 421 U.S. 412, 415 (1975). Treatment of the BLMIS claimants as customers with claims for securities and calculating "net equity" based on the Net

---

[7] We express no view on whether the Net Investment Method should be adjusted to account for inflation or interest, an issue on which the bankruptcy court has not yet ruled and which is not before us on this interlocutory appeal.

16

Investment Method effectuates these purposes.  As the bankruptcy court observed, "[a]ny dollar paid to reimburse a fictitious profit is a dollar no longer available to pay claims for money actually invested.  If the Last Statement Method were adopted," those claimants who have withdrawn funds from their BLMIS accounts that exceed their initial investments "would receive more favorable treatment by profiting from the principal investments of [those claimants who have withdrawn less money than they deposited], yielding an inequitable result."  In re Bernard L. Madoff, 424 B.R. at 141.  The statutory definition of "net equity" does not require the Trustee to aggravate the injuries caused by Madoff's fraud.  Use of the Last Statement Method in this case would have the absurd effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to Madoff's machinations.

**I**

The threshold issues are whether the BLMIS claimants are "customers" within the meaning of SIPA and, if so, whether they are customers with claims for securities or customers with claims for cash.  If the objecting BLMIS claimants are not "customers," 15 U.S.C. § 78lll(2)(A), they are not entitled to the protection of SIPA at all, see Sec.

17

*Inv. Prot. Corp. v. Pepperdine Univ.* (*In re Brentwood Sec., Inc.*), 925 F.2d 325, 327 (9th Cir. 1991). Under SIPA, "[t]he term 'customer' includes . . . any person who has deposited cash with the debtor for the purpose of purchasing securities." 15 U.S.C. § 78lll(2)(B)(i); *see also Tew v. Res. Mgmt.* (*In re ESM Gov't Sec., Inc.*), 812 F.2d 1374, 1376 (11th Cir. 1987) (observing "that it is the act of entrusting the cash to the debtor for the purpose of effecting securities transactions that triggers the customer status provisions" (emphasis omitted)). It also includes:

> . . . [a person] who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral, security, or for purposes of effecting transfer.

15 U.S.C. § 78lll(2)(A). We conclude that the BLMIS claimants are customers with claims for securities within the meaning of SIPA.

While SIPA does not--and cannot--protect an investor against all losses, it "does . . . protect claimants who attempt to invest through their brokerage firm but are defrauded by dishonest brokers." *Ahammed v. Sec. Inv. Prot. Corp.* (*In re Primeline Sec. Corp.*), 295 F.3d 1100, 1107 (10th Cir. 2002). SIPA provides this protection by ensuring

18

that claimants who deposited cash with a broker "for the purpose of purchasing securities," 15 U.S.C. § 78lll(2)(B)(i), are treated as customers with claims for securities.  This is so because the "critical aspect of the 'customer' definition is the entrustment of cash or securities to the broker-dealer *for the purposes of trading securities*."  Appleton v. First Nat'l Bank of Ohio, 62 F.3d 791, 801 (6th Cir. 1995) (emphasis added).

The legislative history supports the view that the BLMIS claimants are customers with claims for securities. "Throughout the [House Report on SIPA,] 'investors' is used synonymously with 'customers,'" and it is clear that an individual who had documentation of his status as a "trading customer . . . was to be protected." Sec. & Exch. Comm'n v. F.O. Baroff Co., 497 F.2d 280, 283 (2d Cir. 1974).  Indeed, treating the BLMIS claimants as customers with claims for securities protects their "legitimate expectations" as investors in the securities market.  S. Rep. No. 95-763, at 2 (1978), reprinted in 1978 U.S.C.C.A.N. 764, 765. Similarly, SIPA's implementing regulations bolster the shared view of the Trustee, SIPC, and the SEC that a claimant who has "written confirmation" that securities have been purchased or sold on his or her behalf should be

19

treated as a customer with a claim for securities.  17 C.F.R. §§ 300.501(b)(1), 300.502(a)(1).  The regulation does not, however, mandate that this "written confirmation" form the basis for calculating a customer's "net equity."

**II**

The BLMIS claimants object that the only way their "legitimate expectations" can be protected is by calculating "net equity" by reference to their last customer statements. We conclude, however, that while the BLMIS customer statements confirm that the BLMIS claimants are properly treated as customers with claims for securities, the last customer statements are not useful for ascertaining "net equity."  We "begin[] where all such inquiries must begin: with the language of the statute itself."  United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989).  Two provisions interact.  SIPA provides that a customer's "net equity" is determined by:

> (A) calculating the sum which *would have been owed* by the debtor to such customer *if the debtor had liquidated*, by sale or purchase on the filing date [of the protective order]--
>
> (i) *all securities positions* of such customer . . . minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . . .

15 U.S.C. § 78lll(11) (emphasis added).  At the same time,

20

SIPA provides that the Trustee should make payments to customers based on "net equity" insofar as the amount owed to the customer is "ascertainable from the *books and records* of the debtor or [is] otherwise established to the *satisfaction of the trustee*."  Id. § 78fff-2(b) (emphasis added).

The objecting BLMIS claimants contend that their "securities positions" should be determined by reference to the "liquidat[ion]" value, id. § 78lll(11)(A), of the securities listed on their last customer statements.  The Trustee argues that the customer statements do not reflect "securities positions" that could be "liquidated" because the account statements were wholly the invention of Madoff and do not reflect actual securities positions; that any pay-out of "net equity" therefore also requires a review of the "books and records" of BLMIS; and that "the books and records of the debtor reveal that the last statements are a fiction."  Br. of Appellee Picard at 28.

We agree with Mr. Picard that a SIPA trustee's obligation to reimburse customers based on "net equity" must be considered together with SIPA's requirement that the Trustee discharge "obligations of the debtor to a customer relating to, or net equity claims based upon . . .

21

securities . . . insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee." 15 U.S.C. § 78fff-2(b)(2); see also Sec. Investor Prot. Corp. v. Lehman Bros. Inc., 433 B.R. 127, 133 (Bankr. S.D.N.Y. 2010) ("Under SIPA, the Trustee is required to determine a 'customer' claim based on the 'net equity' of the customer as shown on the books and records of the debtor." (footnote omitted)). This accords with our usual practice of examining the "overall structure and operation" of a statute. Puello v. Bureau of Citizenship & Immigration Servs., 511 F.3d 324, 329 (2d Cir. 2007). "The meaning of a particular section in a statute can be understood in context with and by reference to the whole statutory scheme, by appreciating how sections relate to one another." Auburn Hous. Auth. v. Martinez, 277 F.3d 138, 144 (2d Cir. 2002). "In other words, the preferred meaning of a statutory provision is one that is consonant with the rest of the statute." Id.

When the terms of the statute are read together, the statute directs that a SIPA trustee should determine a customer's entitlement to recover "net equity" based both on the statutory definition of that term and by reference to the books and records of the debtor. While the language of

22

the statute clearly requires a SIPA trustee to distribute customer property based on "net equity," the statute does not define "net equity" by reference to a customer's last account statement.  Nor does it say specifically how "net equity" should be calculated if a dishonest broker failed to place a customer's funds into the security market, notwithstanding that the customer "deposited cash with the debtor for the purpose of purchasing securities," id. § 78lll(2)(B)(i).

Here, the profits recorded over time on the customer statements were after-the-fact constructs that were based on stock movements that had already taken place, were rigged to reflect a steady and upward trajectory in good times and bad, and were arbitrarily and unequally distributed among customers.  These facts provide powerful reasons for the Trustee's rejection of the Last Statement Method for calculating "net equity."  In addition, if the Trustee had permitted the objecting claimants to recover based on their final account statements, this would have "affect[ed] the limited amount available for distribution from the customer property fund."  In re Bernard L. Madoff, 424 B.R. at 133. The inequitable consequence of such a scheme would be that those who had already withdrawn cash deriving from imaginary

profits in excess of their initial investment would derive additional benefit at the expense of those customers who had not withdrawn funds before the fraud was exposed. Because of these facts, the Net Investment Method better measures "net equity," as statutorily defined, than does the Last Statement Method.[8] As the bankruptcy court reasoned, "[t]he Net Investment Method is appropriate because it relies solely on unmanipulated withdrawals and deposits and refuses to permit Madoff to arbitrarily decide who wins and who loses." In re Bernard L. Madoff, 424 B.R. at 140.

In holding that it was proper for Mr. Picard to reject the Last Statement Method, we expressly do not hold that such a method of calculating "net equity" is inherently impermissible. To the contrary, a customer's last account

---

[8] Because we find that, in this case, the Net Investment Method advocated by Mr. Picard is superior to the Last Statement Method as a matter of law, we have no need to consider whether a SIPA trustee may exercise discretion in selecting a method to calculate "net equity." Fraud is endlessly resourceful and the unraveling of weaved-up sins may sometimes require the grant of a measure of latitude to a SIPA trustee. It therefore appears to us that that in many circumstances a SIPA trustee may, and should, exercise some discretion in determining what method, or combination of methods, will best measure "net equity." We have no reason to doubt that a reviewing court could and should accord a degree of deference to such an exercise of discretion so long as the method chosen by the trustee allocates "net equity" among the competing claimants in a manner that is not clearly inferior to other methods under consideration.

24

statement will likely be the most appropriate means of calculating "net equity" in more conventional cases. We would expect that resort to the Net Investment Method would be rare because this method wipes out all events of a customer's investment history except for cash deposits and withdrawals. The extraordinary facts of this case make the Net Investment Method appropriate, whereas in many instances, it would not be. The Last Statement Method, for example, may be appropriate when securities were actually purchased by the debtor, but then converted by the debtor. Indeed, the Last Statement Method may be especially appropriate where--unlike with the BLMIS accounts at issue in this appeal--customers authorize or direct purchases of specific stocks. See generally Miller v. DeQuine (In re Stratton Oakmont, Inc.), No. 01-CV-2812 RCC, 01-CV-2313 RCC, 2003 WL 22698876 (S.D.N.Y. Nov. 14, 2003).

Ascertaining the proper measure of "net equity" in a given case is for the ultimate purpose of issuing payments to customers; so, the ability to deduce payment amounts (to the satisfaction of the trustee) will bear upon the method selected for calculating "net equity." In this case, the Net Investment Method allows the Trustee to make payments based on withdrawals and deposits, which can be confirmed by the debtor's books and records, and results in a

25

distribution of customer property that is proper under SIPA.

**III**

Under the circumstances of this case, the limitation on the objecting customers' recovery imposed by the Net Investment Method is consistent with the purpose and design of SIPA.  "The principal purpose of SIPA is to protect investors against financial losses arising from the insolvency of their brokers."  In re New Times Sec. Servs., Inc., 463 F.3d 125, 127 (2d Cir. 2006) ("New Times II") (internal quotation marks omitted).  SIPA is also intended to "protect capital markets by instilling confidence in securities traders."  Sec. Investor Prot. Corp. v. Morgan, Kennedy & Co., 533 F.2d 1314, 1317 (2d Cir. 1976).  "SIPA's main purpose [i]s . . . not to prevent fraud or conversion, but to reverse los[s]es resulting from brokers' insolvency."  In re Stratton Oakmont, 2003 WL 22698876, at *5; see also Appleton, 62 F.3d at 801; In re Brentwood Sec., 925 F.2d at 326.

The BLMIS claimants characterize the overall statutory scheme as an insurance guarantee of the securities positions set out in their account statements.  They maintain that SIPA should operate to make them whole from the losses they incurred as a result of Madoff's dishonesty.  We disagree.

While this Court has referred to SIPC as providing a "form of public insurance," Packer, Wilbur & Co., 498 F.2d at 985, it is clear that the obligations imposed on an insurance provider under state law do *not* apply to this congressionally-created "nonprofit membership corporation." Barbour, 421 U.S. at 413; see also, e.g., Rosenbluth Trading, Inc. v. United States, 736 F.2d 43, 46 (2d Cir. 1984) (observing that although Social Security is often referred to as insurance, "[m]anifestly, social security is not traditional insurance, and consequently principles applicable to [insurance policies] . . . need not be imported uncritically into lawsuits involving social security"). Moreover, a registered broker-dealer may obtain insurance under New York law and, in the event of a SIPA liquidation, New York law governs the relative ability of implicated parties to obtain the benefit of insurance coverage. See generally Am. Bank & Trust Co. v. Davis (Matter of F.O. Baroff Co.), 555 F.2d 38, 41-42 (2d Cir. 1977) (stating claimant in SIPA liquidation may share in insurance held by bankrupt debtor).

It is not at all clear that SIPA protects against all forms of fraud committed by brokers. See In re Investors Ctr., Inc., 129 B.R. 339, 353 (Bankr. E.D.N.Y. 1991) ("Repeatedly this Court has been forced to tell claimants

27

that the fund created for the protection of customers of honest, but insolvent, brokers gives them no protection when the insolvent broker has been guilty of dishonesty, breach of contract or fraud."); H.R. Rep. No. 91-1613, at 1 (1970), reprinted in 1970 U.S.C.C.A.N. 5254, 5255 (stating "[t]he primary purpose of [SIPA] . . . is to provide protection for investors if the broker-dealer with whom they are doing business encounters financial troubles").  But it is clear that the statute is not designed to insure investors against *all* losses.  See, e.g., Packer, Wilbur & Co., 498 F.2d at 983 ("SIPA was not designed to provide full protection to all victims of a brokerage collapse."); Sec. Investor Prot. Corp. v. Associated Underwriters, Inc., 423 F. Supp. 168, 171 (D. Utah 1975) (SIPA does not "guarantee that customers will recover their investments which may have diminished as a result of, among other things, market fluctuations or broker-dealer fraud").  But, no party has contested the availability of advances under SIPA to cushion the impact of Madoff's fraud.

In any event, SIPA is intended to expedite the return of *customer property*, and SIPC provides advances on customer property.  Customer property, in turn, is a term defined by the statute as "cash and securities . . . at any time

28

received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."  15 U.S.C. § 78lll(4).  Here, notwithstanding the BLMIS customer statements, there were no securities purchased and there were no proceeds from the money entrusted to Madoff for the purpose of making investments.  Moreover, customers share "ratably" in customer property on the basis of their "net equity," id. § 78fff-2(c)(1)(B); so if customers receive SIPC advances based on property that is a fiction, those advances will necessarily diminish the amount of customer property available to other investors, including those who have not recouped even their initial investment.  Because the main purpose of determining "net equity" is to achieve a fair allocation of the available resources among the customers, the Trustee properly rejected the Last Statement Method as it would have undermined this objective.

**IV**

The objecting claimants maintain that a pair of decisions of this Court--New Times I and New Times II-- dictate that the Last Statement Method be used to calculate "net equity."  We conclude that, to the contrary, our

29

precedent is consistent with the Trustee's decision to utilize the Net Investment Method under the circumstances of this case. And, use of the Last Statement Method in this case would have been an impermissible means of calculating "net equity."

Like the BLMIS litigation, the New Times cases arose out of a Ponzi scheme. After the New Times scheme was exposed, a SIPA trustee was appointed and a liquidation proceeding commenced. New Times I, 371 F.3d at 71. The SIPA trustee divided the claimants into two groups. One group of claimants had been misled to believe that they were investing "in mutual funds that in reality existed." Id. at 74. "[T]he information that these claimants received on their account statements mirrored what would have happened had the given transaction been executed." Id. (internal quotation marks omitted). The New Times SIPA trustee treated these claimants as customers with claims for securities and reimbursed them based on their account statements. The second group of claimants were "fraudulently induced" to buy "shares in bogus mutual funds" that did not exist. Id. at 71. The New Times trustee treated these claimants as customers with claims for cash; they objected; and the district court sustained their objections, holding that they had claims for securities and

30

that their "net equity" should be determined by reference to their customer statements. Id. The New Times Trustee and SIPC appealed.[9]

This Court ruled [i] that the New Times claimants who believed they had invested in mutual funds that did not, in fact, exist, should be treated as customers with claims for securities, but [ii] that their "net equity" could not be calculated by reference to the "fictitious securities positions reflected in the Claimants' account statements." Id. at 75. The New Times I Court was persuaded by the joint view of the SEC and SIPC that "basing customer recoveries on fictitious amounts in the firm's books and records would allow customers to recover arbitrary amounts that necessarily have no relation to reality . . . [and would] leave[] the SIPC fund unacceptably exposed." Id. at 88 (internal quotation marks omitted). Calculations based on made-up values of fictional securities would be "unworkable" and would create "potential absurdities." Id. Accordingly, it was held that "each Claimant's net equity should be calculated by reference to the amount of money the Claimants originally invested with the Debtors (*not* including any

---

[9] The New Times claimants who were originally treated as customers with claims for securities and compensated based on their customer statements were never before this Court.

31

fictitious interest or dividend reinvestments)."  Id. at 71.

In New Times II, this Court concluded that investors in New Times Securities Services who, prior to the SIPA proceeding, "were induced to liquidate their accounts . . . and make a loan of the imaginary funds to the brokerage house and to [the principal]" were not customers within the meaning of SIPA.  New Times II, 463 F.3d at 126, 129.  They could only legitimately have expected to be treated as lenders unprotected by SIPA.  Id. at 130.

Taken together, New Times I and New Times II militate in favor of limiting recovery by BLMIS claimants to their Net Investment.  True, the objecting BLMIS claimants are unlike the appellants in New Times I because their customer statements reflected investments in real stocks listed on the Standard & Poor's 100 Index.  However, the objecting BLMIS claimants are similarly situated to the New Times appellants in a crucial respect: assessing "net equity" based on their customer statements would require the Trustee to establish each claimant's "net equity" based on a fiction created by the perpetrator of the fraud.  Commenting on the New Times I decision, the New Times II Court stated:

> The court declined to base the recovery on the rosy account statements telling customers how well the imaginary securities were doing, because treating the fictitious paper profits as within the ambit of the customers' "legitimate

32

expectations" would lead to the absurdity of "duped" investors reaping windfalls as a result of fraudulent promises made on fake securities.

Id. at 130 (quoting New Times I, 371 F.3d at 87-88).

Madoff constructed account statements retrospectively, designating stocks based on advantageous historical price information and arbitrarily distributing profits among his customers.[10] It would therefore have been legal error for the Trustee to "discharge claims upon the false premise that customers' securities positions are what the account statements purport them to be." In re Bernard L. Madoff, 424 B.R. at 135. The Trustee properly declined to calculate "net equity" by reference to impossible transactions. Indeed, if the Trustee had done otherwise, the whim of the defrauder would have controlled the process that is supposed to unwind the fraud.

In any event, SIPA covers potentially a multitude of situations; no one size fits all. See Exch. Nat'l Bank of Chicago v. Wyatt, 517 F.2d 453, 459 n.12 (2d Cir. 1975) (stating SIPA "liquidation procedures have been carefully designed to allow flexibility"). The fact that the trustee appointed to oversee the liquidation underlying the New Times cases calculated "net equity" in one manner is not

_____

[10] Some purported trades were settled outside the Stock Exchange's price range for the trade dates.

determinative as to the proper method of ascertaining "net equity" in this case.[11]  The <u>New Times</u> trustee calculated "net equity" based on customer statements for those claimants whose account statements "mirrored what would have happened had the given transaction[s] been executed."  <u>New Times I</u>, 371 F.3d at 74 (internal quotation marks omitted).  Here, however, the BLMIS customer statements reflect impossible transactions and the Trustee is not obligated to step into the shoes of the defrauder or treat the customer statements as reflections of reality.

## CONCLUSION

---

[11] A SIPA liquidation is a hybrid proceeding.  <u>See</u> 15 U.S.C. § 78fff-1(a) ("A trustee shall be vested with the same powers and title with respect to the debtor and the property of the debtor, including the same rights to avoid preferences, as a trustee in a case under Title 11."); <u>id.</u> § 78fff(b) ("To the extent consistent with the provisions of this chapter, a liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under [the Bankruptcy Code]."); <u>see also</u> <u>In re Housecraft Indus. USA, Inc.</u>, 310 F.3d 64, 71 (2d Cir. 2002) (stating bankruptcy trustee may avoid fraudulent transactions).  As the bankruptcy court ruled, "SIPA and the [Bankruptcy] Code intersect to . . . grant a SIPA trustee the power to avoid fraudulent transfers for the benefit of customers."  <u>In re Bernard L. Madoff</u>, 424 B.R. at 136.  The objecting BLMIS claimants point out that no avoidance power has been invoked in this case.  True, however--in the context of *this* Ponzi scheme--the Net Investment Method is nonetheless more harmonious with provisions of the Bankruptcy Code that allow a trustee to avoid transfers made with the intent to defraud, <u>see</u> 11 U.S.C. § 548(a)(1)(A), and "avoid[s] placing some claims unfairly ahead of others," <u>In re Adler, Coleman Clearing Corp.</u>, 263 B.R. 406, 463 (Bankr. S.D.N.Y. 2001).

For the reasons set forth above, we affirm the order of the United States Bankruptcy Court for the Southern District of New York (Lifland, J.) and hold that use of the Net Investment Method for calculating the "net equity" of the BLMIS customers was proper.