11-5044; 11-5051; 11-5175; 11-5207
In re: Bernard L. Madoff Investment Securities
Picard v. JP Morgan Chase & Co., 11-5044
Picard v. Egger, 11-5051
Picard v. UniCredit Bank Austria AG, 11-5175
Picard v. HSBC Bank PLC, 11-5207

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2012

(Argued: November 21, 2012     Decided: June 20, 2013)

Docket Nos. 11-5044
11-5051
11-5175
11-5207

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE: BERNARD L. MADOFF INVESTMENT SECURITIES LLC.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IRVING H. PICARD,

Plaintiff-Appellant,

- v.-

JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN
SECURITIES LLC, J.P. MORGAN SECURITIES LTD.,

Defendants-Appellees,

and

SECURITIES INVESTOR PROTECTION CORPORATION,

Intervenor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE: BERNARD L. MADOFF INVESTMENT SECURITIES LLC,

                    Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IRVING H. PICARD,

                    Plaintiff-Appellant,

          and

SECURITIES INVESTOR PROTECTION CORPORATION,

                    Intervenor,

          - v.-

UBS FUND SERVICES (LUXEMBOURG) SA, ACCESS INTERNATIONAL ADVISORS LLC, ACCESS INTERNATIONAL ADVISORS EUROPES LIMITED, ACCESS INTERNATIONAL ADVISORS LTD., ACCESS PARTNERS (SUISSE) SA, ACCESS MANAGEMENT LUXEMBOURG SA, as represented by its Liquidator MAITRE FERDINAND ENTRINGER, FKA ACESS INTERNATIONAL ADVISORS LUXEMBOURG SA, ACCESS PARTNERS SA, as represented by its Liquidator MAITRE FERDINAND ENTRINGER, PATRICK LITTAYE, CLAUDINE MAGON DE LA VILLEHUCHET, in her capacity as Executrix under the WILL OF THIERRY MAGON DE LA VILLEHUCHET (AKA Rene Thierry de la Villehuchet), individually and as the sole beneficiary under the WILL OF THIERRY MAGON DE LA VILLEHUCHET (AKA Rene Thierry de la Villehuchet), AKA CLAUDINE DE LA VILLEHUCHET, PIERRE DELANDMETER, THEODORE DUMBAULD, LUXALPHA SICA V, as represented by its Liquidators MAITRE ALAIN RUKAVINA and PAUL LAPLUME, ROGER HARTMANN, RALF SHROETER, RENE EGGER, ALAIN HONDEQUIN, HERMANN KRANZ, BERNARD STIEHL, GROUPEMENT FINANCIER LTD., UBS AG, UBS (LUXEMBOURG) SA, MAITRE ALAIN RUKAVINA, in his capacity as liquidator and representative of LUXALPHA SICA V, PAUL LAPLUME, in his capacity as liquidator and representative of LUXALPHA SICA V, UBS THIRD PARTY MANAGEMENT COMPANY SA,

                    Defendants-Appellees.

2

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE: BERNARD L. MADOFF INVESTMENT SECURITIES LLC,

        Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IRVING H. PICARD,

        Plaintiff-Appellant,

        - v.-

HSBC BANK PLC, HSBC SECURITIES SERVICES (LUXEMBOURG) S.A., HSBC BANK BERMUDA LIMITED, HSBC FUND SERVICES (LUXEMBOURG) S.A., HSBC PRIVATE BANK (SUISSE) S.A., HSBC PRIVATE BANKING HOLDINGS (SUISSE) S.A., HSBC BANK (CAYMAN) LIMITED, HSBC SECURITIES SERVICES (BERMUDA) LIMITED, HSBC BANK USA, N.A., HSBC INSTITUTIONAL TRUST SERVICES (BERMUDA) LIMITED, HSBC SECURITIES SERVICES (IRELAND) LIMITED, HSBC INSTITUTIONAL TRUST SERVICES (IRELAND) LIMITED, HSBC HOLDINGS PLC, UNICREDIT S.p.A., PIONEER ALTERNATIVE INVESTMENT MANAGEMENT LIMITED, UNICREDIT BANK AUSTRIA AG, ALPHA PRIME FUND LIMITED,

        Defendants-Appellees,

        and

SECURITIES INVESTOR PROTECTION CORPORATION,

        Intervenor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE: BERNARD L. MADOFF INVESTMENT SECURITIES LLC,

        Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

3

IRVING H. PICARD,

Plaintiff-Appellant,

- v.-

HSBC BANK PLC, HSBC SECURITIES SERVICES (LUXEMBOURG) S.A., HSBC BANK BERMUDA LIMITED, HSBC PRIVATE BANK (SUISSE) S.A., HSBC PRIVATE BANKING HOLDINGS (SUISSE) S.A., HSBC BANK (CAYMAN) LIMITED, HSBC SECURITIES SERVICES (BERMUDA) LIMITED, HSBC BANK USA, N.A., HSBC INSTITUTIONAL TRUST SERVICES (BERMUDA) LIMITED, HSBC SECURITIES SERVICES (IRELAND) LIMITED, HSBC INSTITUTIONAL TRUST SERVICES (IRELAND) LIMITED, HSBC HOLDINGS PLC, HSBC FUND SERVICES (LUXEMBOURG) S.A.,

Defendants-Appellees,

SECURITIES INVESTOR PROTECTION CORPORATION,

Intervenor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Before:     JACOBS, Chief Judge, WINTER and CARNEY, Circuit Judges.

A trustee appointed pursuant to the Securities Investor Protection Act appeals from the dismissal of his claims brought on behalf of the debtor and the debtor's customers, asserting that various financial institutions and other defendants aided and abetted the debtor's fraud.  The United States District Court for the Southern District of New York (McMahon and Rakoff, JJ.) held that the claims were barred by the doctrine of in pari delicto and that the trustee lacked standing to pursue claims on behalf of customers.  We affirm.

4

OREN J. WARSHAVSKY (David J. Sheehan, Deborah H. Renner, Lan Hoang, Geoffrey A. North on the brief) Baker & Hostetler LLP, New York, New York for Plaintiff-Appellant.

CHRISTOPHER H. LAROSA (Josephine Wang, Kevin H. Bell, on the brief) Securities Investor Protection Corporation, Washington, D.C. for Intervenor Securities Investor Protection Corporation.

JOHN F. SAVARESE (Douglas K. Mayer, Stephen R. DiPrima, Emil A. Kleinhaus, Lauren M. Kofke, Jonathon R. La Chapelle on the brief) Wachtell, Lipton, Rosen & Katz, New York, New York for Defendant-Appellee JPMorgan Chase & Co., et al.

THOMAS J. MOLONEY (Evan A. Davis, David E. Brodsky, Marla A. Decker, Charles J. Keeley, Jason B. Frasco on the brief) Cleary Gottlieb Steen & Hamilton LLP, New York, New York for Defendant-Appellee HSBC Bank plc, et al.

MARCO E. SCHNABL (Susan L. Saltzstein, Jeremy A. Berman on the brief) Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York for Defendants-Appellees UniCredit S.p.A. and Pioneer Alternative Investment Management Ltd.

MARSHALL R. KING, Gibson, Dunn & Crutcher LLP, New York, New York for Defendant-Appellee UBS AG, et al.

FRANKLIN B. VELIE (Jonathan G. Kortmansky, Mitchell C. Stein on the brief) Sullivan & Worcester LLP, New York, New York for Defendant-Appellee UniCredit Bank Austria AG.

Robert W. Gottlieb, Katten Muchin Rosenman LLP, New York, New York for Defendant-Appellee Access International Advisers, LLC, et al.

Brett S. Moore, Porzio Bromberg & Newman P.C., New York, New York for Defendant-Appellee Luxalpha Sicav, et al.

Robert Knuts, Park & Jensen LLP, New York, New York for Defendant-Appellee Theodore Dumbauld.

DENNIS JACOBS, Chief Judge:

Irving Picard ("Picard" or the "Trustee") sues in his capacity as Trustee under the Securities Investor Protection Act ("SIPA") on behalf of victims in the multi-billion-dollar Ponzi scheme worked by Bernard Madoff.  The four actions presently before this Court allege that numerous major financial institutions aided and abetted the fraud, collecting steep fees while ignoring blatant warning signs.  In summary, the complaints allege that, when the Defendants were confronted with evidence of Madoff's illegitimate

6

scheme, their banking fees gave incentive to look away, or at least caused a failure to perform due diligence that would have revealed the fraud.  The Trustee asserts claims for unjust enrichment, breach of fiduciary duty, aiding and abetting fraud, and negligence, among others.  The Trustee's position is supported by the Securities Investor Protection Corporation ("SIPC"), a statutorily created nonprofit corporation consisting of registered broker-dealers and members of national securities exchanges, which intervened to recover some or all of the approximately $800 million it advanced to victims.

As we will explain, the doctrine of in pari delicto bars the Trustee (who stands in Madoff's shoes) from asserting claims directly against the Defendants on behalf of the *estate* for wrongdoing in which Madoff (to say the least) participated.  The claim for contribution is likewise unfounded, as SIPA provides no such right.  The decisive issue, then, is whether the Trustee has standing to pursue the common law claims on behalf of Madoff's *customers*.  Two thorough well-reasoned opinions by the district courts held that he does not.  See Picard v. HSBC Bank PLC, 454 B.R. 25 (S.D.N.Y. 2011) (Rakoff, J.); Picard v. JPMorgan Chase & Co., 460 B.R. 84 (S.D.N.Y. 2011) (McMahon, J.).

7

Our holding relies on a rooted principle of standing: A party must "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Seldin, 422 U.S. 490, 499 (1975). This prudential limitation has been consistently applied in the bankruptcy context to bar suits brought by trustees on behalf of creditors. See, e.g., Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416 (1972); Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 118 (2d Cir. 1991).

Picard offers two theories for why a SIPA liquidation is a different creature entirely, and why therefore a SIPA trustee enjoys third-party standing: (1) He is acting as a bailee of customer property and therefore can pursue actions on customers' behalf to recover such property; and (2) he is enforcing SIPC's rights of equitable and statutory subrogation to recoup funds advanced to Madoff's customers. Neither is compelling. Although a SIPA liquidation is not a traditional bankruptcy, a SIPA trustee is vested with the "same powers and title with respect to the debtor and the property of the debtor . . . as a trustee in a case under Title 11." 15 U.S.C. § 78fff-1(a). At best, SIPA is silent

8

as to the questions presented here.  And analogies to the law of bailment and the law of subrogation are inapt and unconvincing.[1]

**BACKGROUND**

In December 2008, federal agents arrested Bernard L. Madoff, who had conducted the largest Ponzi scheme yet uncovered.  Madoff purported to employ a "split-strike conversion strategy" that involved buying S&P 100 stocks and hedging through the use of options.  In reality, he engaged in no securities transactions at all.[2]

---

[1] The Defendants also argue that the Trustee has not met constitutional standing requirements, violates the Securities Litigation Uniform Standards Act, and fails to plead with particularity SIPC's purported subrogation claims.  Given our holding, we decline to address these arguments.

[2] Although Madoff simply appropriated his clients' money without ever purchasing securities on their behalf, we have held that Madoff's victims are nonetheless "customers" under the Act.  See In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d 229, 236 (2d Cir. 2011) ("SIPA . . . ensur[es] that claimants who deposited cash with a broker for the purpose of purchasing securities, are treated as customers with claims for securities.  This is so because the critical aspect of the 'customer' definition is the entrustment of cash or securities to the broker-dealer *for the purposes of trading securities*.") (internal citations and quotation marks omitted), cert. denied, 133 S. Ct. 25 (2012).

In March 2009, Madoff pleaded guilty to securities fraud and admitted that he had used his brokerage firm, Bernard L. Madoff Investment Securities LLC ("BLMIS"), as a vast Ponzi scheme. The details of Madoff's fraud have been recounted many times. See, e.g., In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d 229, 231-32 (2d Cir. 2011), cert. denied, 133 S. Ct. 25 (2012); In re Bernard L. Madoff Inv. Sec. LLC, 424 B.R. 122, 126–32 (Bankr. S.D.N.Y. 2010).

Following Madoff's arrest, SIPC filed an application under SIPA, 15 U.S.C. § 78eee(a)(4)(B), asserting that BLMIS required protection. The district court appointed Picard as the firm's Trustee and referred the case to the bankruptcy court.

SIPA was enacted in 1970 to speed the distribution of "customer property" back to investors following a firm's collapse.[3] Customer property is cash and securities held separately from the general estate of the failed brokerage firm. "SIPA serves dual purposes: to protect investors, and to protect the securities market as a whole." In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d at 235. A SIPA

---

[3] For a succinct overview of the statute's history, see Securities Investor Protection Corp. v. BDO Seidman, LLP, 49 F. Supp. 2d 644, 649 (S.D.N.Y. 1999).

liquidation confers priority on customer claims by an expeditious alternative to a traditional bankruptcy proceeding. Under SIPA, each customer shares ratably in the fund of customer property according to the customer's "net equity."

If (as is often the case) the assets are not enough to satisfy all net equity claims, SIPC advances money (up to $500,000 per customer) to the SIPA trustee, who is charged with assessing customer claims and making the ratable distributions. At the time of this appeal, SIPC had advanced approximately $800 million.

A trustee also has authority to investigate the circumstances surrounding the insolvency and to recover and distribute any remaining funds to creditors. Picard alleges that his investigation has uncovered evidence of wrongdoing by third parties who aided and abetted Madoff, and seeks to replenish the fund of customer property by taking action against various financial institutions that serviced BLMIS.

Picard presses claims against JPMorgan Chase & Co., UBS AG, UniCredit Bank Austria AG, HSBC Bank plc, and affiliated persons and entities. The allegations against each are summarized one by one. We distill the detailed allegations

11

from the consolidated complaints, and recount only the background needed to understand our analysis.  At this stage of the litigation, the allegations are assumed to be true.  See Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009).

**JPMorgan**.  Madoff maintained a checking account at JPMorgan Chase & Co. ("JPMorgan")[4] for more than twenty years, beginning in 1986.  In the years prior to BLMIS's bankruptcy, JPMorgan collected an estimated half billion dollars in fees, interest payments, and revenue from BLMIS.  The Trustee alleges that JPMorgan was "at the very center" of Madoff's fraud and was "thoroughly complicit" in it.  A 662 ¶ 1.[5]  Madoff's primary account with JPMorgan, the "703 Account," was where hundreds of billions of dollars of customer money were "commingled and ultimately washed."  A 663 ¶ 2.  The customer funds deposited into the 703 Account for "split-strike" securities transactions were instead funneled to other customers to sustain the illusion of large and reliable returns on investment.

---

[4] Throughout this brief, "JPMorgan" refers to the four JPMorgan defendants: JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, and J.P. Morgan Securities Ltd.

[5] Record citations refer to the joint appendix filed in the action under discussion.

The 703 Account was a retail checking account, not a commercial account. Billions of dollars from thousands of investors were deposited without being segregated or transferred to separate sub-accounts. These accounts exhibited, on their face, a "glaring absence of securities activity." A 714 ¶ 190. At the same time, numerous multi-million-dollar checks and wire transfers having no apparent business purpose were exchanged between Madoff and his close friend, Norman Levy (now dead).

In 2006, due diligence conducted by JPMorgan revealed strong and steady yields by Madoff's feeder funds during a time when the S&P 100 dropped thirty percent. As one money manager later acknowledged, that was too good to be true. In June 2007, JPMorgan's Chief Risk Officer John Hogan learned at a lunch with JPMorgan money manager Matt Zames that "there is a well-known cloud over the head of Madoff and that his returns are speculated to be part of a [P]onzi scheme." A 695 ¶ 119. Hogan asked a junior analyst to run a Google search on Madoff, and made no further inquiries when the search yielded no hard evidence.

Faced with "numerous indications of Madoff's fraud," in the fall of 2008 JPMorgan redeemed $276 million of its

13

investments in Madoff's feeder funds.  A 705 ¶¶ 156-60; A 710 ¶ 178.  But the company failed to tip off regulators or other investors.  Though JPMorgan was uniquely positioned to put an end to Madoff's fraud, it quietly continued collecting its large fees.

**UBS and Access.**  Defendants UBS AG[6] ("UBS") and Access International Advisors LLC[7] ("Access") are sued for aiding and abetting Madoff's fraud by creating feeder funds and collecting investments from abroad.  UBS acted as sponsor, manager, administrator, custodian, and primary banker of the funds.  UBS reaped at least $80 million in fees as it facilitated investments in BLMIS, despite clear indicia of fraud.  The "prestigious name" of UBS was used "to legitimize and attract money to Madoff's fraud," but UBS

---

[6] "UBS" includes UBS AG, UBS (Luxembourg) S.A., UBS Fund Services (Luxembourg) S.A., UBS Third Party Management Company S.A., Roger Hartmann, Ralf Schroter, Rene Egger, Bernd Stiehl, Alain Hondequin, and Hermann Kranz.

[7] "Access" includes Access International Advisors LLC, Access International Advisors Europe Limited, Access International Advisors Ltd., Access Partners (Suisse) S.A., Access Management Luxembourg S.A., Access Partners S.A., Patrick Littaye, Claudine Magnon de la Villehuchet (in her capacities as Executrix and sole beneficiary of the Will of Thierry Magnon de la Villehuchet), Pierre Delandmeter, and Theodore Dumbauld.  The Trustee also sues feeder funds created by UBS and Access such as Defendants Luxalpha SICA V and Groupement.

14

agreed to "look the other way and to pretend that they were truly ensuring the existence of assets and trades when in fact they were not and never did."  A 916 ¶ 5.

UBS observed but ignored Madoff's lack of transparency and his uncanny ability to generate consistently high returns, except insofar as UBS declined to invest its own money in BLMIS or endorse Madoff's funds to its clients. In 2009, the Luxembourg regulator, the Commission de Surveillance du Secteur Financier, indicated that the failure of UBS to identify Madoff as a possible fraud was a violation of Luxembourg law.

Access was also alerted to Madoff's suspicious investment activities.  In 2006, internal managers at Access became worried about the volume of options trades being reported by Madoff, and hired an independent consultant to investigate.  The consultant concluded that Madoff could not possibly have executed the volume of options or equities trades he reported, and that his trading revealed "either extremely sloppy errors or serious omissions" that suggest he "doesn't really understand the costs of the option strategy."  A 977 ¶ 218 (emphasis removed).  Access concealed the consultant's findings and continued active

15

recruitment of investors for Madoff's feeder funds in order to keep churning its fees.

**Unicredit**.  Madoff's fraud drew billions from abroad. With the help of UniCredit Bank Austria AG ("Bank Austria") and 20:20 Medici AG ("Bank Medici"), one Sonja Kohn established several Madoff feeder funds (the "Medici Funds").  Together, they funneled nearly $3 billion into BLMIS.  UniCredit S.p.A. and its two subsidiaries, Pioneer Alternative Investment Management Limited ("Pioneer") and Bank Austria (collectively, the "UniCredit entities"), helped to promote the Medici Funds and thereby facilitated the fraud.

The UniCredit entities and their affiliates made a lot of money servicing the Medici funds: Bank Medici took more than $15 million in fees; and BA Worldwide, more than $68 million.  The UniCredit entities were well aware that Madoff's returns were highly suspicious, and that the extent of BLMIS's trading activities was facially impossible.  Yet they continued to aggressively market the Madoff feeder funds to new customers while purporting to provide oversight.  Among the signs overlooked by the UniCredit entities were Madoff's failure to identify counterparties to

16

BLMIS's options transactions, BLMIS's atypical fee structure, and Madoff's impossibly high volume of transactions.  Shortly after Madoff's arrest, a senior research analyst at Pioneer wrote, "[w]e should be the professionals protecting investors from this fraud . . . [but] there is not one [due diligence] report in the files except for one in May 2005."  A 136 ¶ 314 (brackets in original).

**HSBC**.  HSBC Bank plc ("HSBC")[8] established Madoff feeder funds (at least eighteen in seven different countries) that injected capital into the Ponzi scheme while ignoring obvious warning signs.  As custodian and administrator of the funds, HSBC was required to hold the fund assets and handle day-to-day operations.  HSBC also created derivative products, such as notes and swaps, to increase the flow of investment.  These funds fed at least

---

[8] The HSBC Defendants include HSBC Bank plc, HSBC Holdings plc, HSBC Securities Services (Luxembourg) S.A., HSBC Institutional Trust Services (Ireland) Limited, HSBC Securities Services (Ireland) Limited, HSBC Institutional Trust Services (Bermuda) Limited, HSBC Bank USA, N.A., HSBC Securities Services (Bermuda) Limited, HSBC Bank (Cayman) Limited, HSBC Private Banking Holdings (Suisse) S.A., HSBC Private Bank (Suisse) S.A., HSBC Fund Services (Luxembourg) S.A., and HSBC Bank Bermuda Limited.

$8.9 billion into Madoff's scheme, a sum representing nearly forty percent of BLMIS's capital under management.

HSBC represented to customers that it exercised supervision and control over fund assets, whereas BLMIS itself took the role of custodian. Had HSBC performed oversight diligently, it would have seen thousands of instances in which Madoff's purported trades exceeded the total market volume of such trades on the given day. Repeatedly, industry analysts and HSBC's own due diligence team openly questioned Madoff's extraordinary success, lack of transparency, and incredible trading volume.

In September 2005, HSBC commissioned KPMG LLP to detect potential fraud in BLMIS's operations. Resulting reports in 2006 and 2008 warned that BLMIS's role as custodian of its own funds posed a risk that the trades were "a sham in order to divert client cash." A 89 ¶ 168. Nonetheless, HSBC continued to "enable[]" Madoff in order to reap a windfall. A 35 ¶ 1. In sum, HSBC "engineered a labyrinth of hedge funds, management companies, and service providers that, to unsuspecting outsiders, seemed to compose a formidable system of checks and balances," yet, in reality, "it provided different modes for directing money to Madoff while avoiding scrutiny and maximizing fees." A 36 ¶ 4.

18

**Procedural History**.  On July 15, 2009, the Trustee commenced an adversary proceeding in the United States Bankruptcy Court for the Southern District of New York against HSBC and thirty-six others, including UniCredit and Pioneer.[9]  The Amended Complaint sought recovery of $2 billion in preferential or fraudulent transfers (Counts 1 through 19), and asserted four common law causes of action: aiding and abetting fraud, aiding and abetting breach of fiduciary duty, unjust enrichment, and money had and received (collectively, the "common law claims").  These common law claims sought $6.6 billion from HSBC and $2 billion from the remaining defendants.  A contribution claim was asserted under New York law.

On a motion by the UniCredit entities, the district court withdrew the reference to the bankruptcy court, for the limited purpose of deciding two threshold issues: (1) the Trustee's standing to assert the common law claims, and (2) preemption of these claims by the Securities Litigation Uniform Standards Act ("SLUSA").

The common law claims and the contribution claim were dismissed by Judge Rakoff in July 2011, on the grounds that

---

[9] This proceeding consolidated two actions, one against HSBC and one against UniCredit and Pioneer.

the Trustee was in pari delicto with the defendants, lacked standing to assert the common law claims on customers' behalf, and could not demonstrate a right to contribution. See Picard v. HSBC Bank PLC, 454 B.R. 25, 37 (S.D.N.Y. 2011). The court did not reach the question whether SLUSA bars the Trustee's claims. Id.

The Trustee's adversary proceeding against JPMorgan was commenced in December 2010. As in the proceedings against HSBC and UniCredit, the Trustee asserted common law claims seeking $19 billion for, inter alia, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, unjust enrichment, and conversion.

The adversary proceeding against UBS followed. Also named were Access, several of its affiliates, and two feeder funds. Again, the Trustee asserted common law claims for aiding and abetting fraud, aiding and abetting breach of fiduciary duty, unjust enrichment, and conversion, among others. Damages of approximately $2 billion were sought on behalf of the customers of BLMIS (rather than BLMIS itself).

All Defendants (except Luxalpha and two individual Defendants) moved to dismiss the common law claims and the contribution claim. In November 2011, Judge McMahon granted the motions. See Picard v. JPMorgan Chase & Co., 460 B.R.

20

84 (S.D.N.Y. 2011). Judge McMahon concluded (as did Judge Rakoff) that the Trustee lacks standing to bring an action on behalf of third parties and has no valid claim for contribution. Id. at 106.

**DISCUSSION**

We review de novo a district court's dismissal of causes of action for failure to state a claim for relief or lack of standing. See Fulton v. Goord, 591 F.3d 37, 41 (2d Cir. 2009). Point I considers the Trustee's claims as asserted by him on behalf of BLMIS itself; Point II considers claims asserted by the Trustee on behalf of BLMIS's customers.

**I**

We agree with the district courts that the Trustee's common law claims asserted on behalf of BLMIS are barred by the doctrine of in pari delicto.

**A**

Under New York law,[10] one wrongdoer may not recover against another. See Kirschner v. KPMG LLP, 938 N.E.2d 941,

---

[10] "In a bankruptcy proceeding, state law . . . determines whether a right to sue belongs to the debtor or to the individual creditors." Wight v. BankAmerica Corp., 219 F.3d 79, 86 (2d Cir. 2000) (citation and internal quotation marks omitted). New York law governs here.

21

950 (N.Y. 2010). The principle that a wrongdoer should not profit from his own misconduct "is . . . strong in New York." Id. at 964. The New York Appellate Division, First Department, has long applied the doctrine of in pari delicto to bar a debtor from suing third parties for a fraud in which he participated. See Barnes v. Hirsch, 212 N.Y.S. 536, 539 (App. Div. 1st Dep't 1925) ("The bankrupts could not recover against these defendants for bucketing orders because they were responsible for the illegal transaction and parties to the fraud."), aff'd, 152 N.E. 424 (N.Y. 1926).

A "claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 120 (2d Cir. 1991) (citing Barnes, 212 N.Y.S. at 537). The debtor's misconduct is imputed to the trustee because, innocent as he may be, he acts as the debtor's representative. See Wight v. BankAmerica Corp., 219 F.3d 79, 87 (2d Cir. 2000) ("[B]ecause a trustee stands in the shoes of the corporation, the Wagoner rule bars a trustee from suing to recover for a wrong that he himself essentially took part

in."); accord Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Grp., Inc.), 336 F.3d 94, 99-100 (2d Cir. 2003) (applying Wagoner rule in the context of "the greatest Ponzi scheme [then] on record" and holding that "the defrauded investors and not the bankruptcy trustee" were entitled to pursue malpractice claims against attorneys and accountants arising from the fraud).[11]

Picard alleges that the Defendants were complicit in Madoff's fraud and facilitated his Ponzi scheme by providing (well-paid) financial services while ignoring obvious warning signs.  These claims fall squarely within the rule of Wagoner and the ensuing cases: Picard stands in the shoes of BLMIS and may not assert claims against third parties for participating in a fraud that BLMIS orchestrated.

---

[11] See also Kirschner v. Grant Thornton LLP, No. 07 Civ. 11604 (GEL), 2009 WL 1286326, at *10 (S.D.N.Y. Apr. 14, 2009) (applying Wagoner rule to dismiss fraud and breach of fiduciary claims where the debtor "participated in, and benefitted from, the very wrong for which it seeks to recover"), aff'd, 626 F.3d 673 (2d Cir. 2010); Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1094-95 (2d Cir. 1995) (holding that even though "there [was] at least a theoretical possibility that some independent financial injury to the Debtors might be established," the Wagoner rule precluded standing "because of the Debtors' collaboration with the defendants-appellees in promulgating and promoting the Colonial Ponzi schemes").

23

Picard's scattershot responses are resourceful, but they all miss the mark. He contends that a SIPA trustee is exempt from the Wagoner rule, but adduces no authority. He argues that the rationale of the in pari delicto doctrine is not served here because he himself is not a wrongdoer; but neither were the trustees in the cases cited above.[12] He contends that in pari delicto should not impede the enforcement of securities laws, citing Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299 (1985); but Bateman Eichler is inapposite. See id. at 315-16 (holding that in pari delicto would not prevent defrauded tippee from bringing suit against defrauding tipper, at least absent further inquiry into "relative culpabilities" of tippee and tipper).[13] He invokes the "adverse interest" exception,

_____

[12] Relatedly, he argues that in a typical bankruptcy in pari delicto is designed to bar corporate malefactors, including shareholders, from recovering, whereas in a SIPA liquidation the trustee marshals assets for the benefit of the customer property estate. Accordingly, there is no similar concern here that funds collected by the trustee would be distributed to wrongdoers. But, in Kirschner v. KPMG LLP, the New York Court of Appeals declined to make an exception to the in pari delicto doctrine despite the trustee's urging that proceeds would "benefit blameless unsecured creditors . . . and shareholders." Kirschner v. KPMG LLP, 938 N.E.2d 941, 958 (N.Y. 2010).

[13] Like the Supreme Court in Bateman Eichler, we recently declined to apply in pari delicto to bar suit in a private civil antitrust action, "where private actions play

24

which directs a court not to impute to a corporation the bad acts of its agent when the fraud was committed for personal benefit.  See The Mediators, Inc. v. Manney (In re Mediators, Inc.), 105 F.3d 822, 827 (2d Cir. 1997).  However, "this most narrow of exceptions" is reserved for cases of "outright theft or looting or embezzlement . . . where the fraud is committed *against* a corporation rather than on its behalf."[14]  Kirschner v. KPMG LLP, 938 N.E.2d 941, 952 (N.Y. 2010).  It is not possible thus to separate

---

a significant role in the enforcement scheme."  Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C., 711 F.3d 68, 80 (2d Cir. 2013) (dismissing action on threshold question of antitrust standing).  Here, in contrast, barring claims brought by Madoff's successor-in-interest would not preclude his victims from bringing suit individually.  See infra p. 58 n.29.  In pari delicto does not apply to all wrongdoers; the doctrine targets those who "actively participate in the illegal scheme and who are substantially at fault."  Gatt Commc'ns, 711 F.3d at 84 (Wesley, J., concurring).  The pleadings here leave us with no doubt that BLMIS--in whose shoes the Trustee stands--bore at least "substantially equal responsibility" for the injuries the Trustee now seeks to redress.  See Bateman Eichler, 472 U.S. at 310-11.  Accordingly, application of the rule in this context is well established.  See, e.g., Wagoner, 944 F.2d at 120; Wight, 219 F.3d at 87.

[14] When, as here, principal and agent are "one and the same . . . the adverse interest exception is itself subject to an exception styled the 'sole actor' rule," which "imputes the agent's knowledge to the principal notwithstanding the agent's self-dealing."  In re Mediators, Inc., 105 F.3d at 827.

25

BLMIS from Madoff himself and his scheme. Finally, Picard argues that the district courts should not have applied the in pari delicto doctrine at the pleadings stage; but the New York Court of Appeals has held otherwise. See id. at 947 n.3; see also Wagoner, 944 F.2d at 120. Early resolution is appropriate where (as here) the outcome is plain on the face of the pleadings.

**B.**

The Trustee's claim for contribution is the only one that may escape the bar of in pari delicto. See Barrett v. United States, 853 F.2d 124, 127 n.3 (2d Cir. 1988) (explaining that parties seeking contribution are necessarily in pari delicto).[15] The Trustee seeks contribution for payments made to BLMIS customers under SIPA, on the theory that the Defendants are joint tortfeasors with BLMIS under New York law.

---

[15] Some courts have suggested that Wagoner nevertheless bars a contribution claim. See, e.g., Devon Mobile Commc'ns Liquidating Trust v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.), 322 B.R. 509, 529 (Bankr. S.D.N.Y. 2005); Silverman v. Meister Seelig & Fein, LLP (In re Agape World, Inc.), 467 B.R. 556, 580-81 (Bankr. E.D.N.Y. 2012). We need not decide whether such a claim would survive a Wagoner challenge because, as explained in text, there is no contribution right under SIPA.

The New York statute provides that "two or more persons who are subject to liability for damages for the same personal injury, injury to property or wrongful death, may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought." N.Y. C.P.L.R. § 1401 (McKinney). Section 1401 "requires some form of compulsion; that is, the party seeking contribution must have been compelled in some way, such as through the entry of a judgment, *to make the payment against which contribution is sought*." N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp., No. 3:03-CV-0438 (DEP), 2007 WL 1434901, at *7 (N.D.N.Y. May 11, 2007) (emphasis added).

However, the SIPA payments for which Picard seeks contribution were not compelled by BLMIS's state law fraud liability to its customers; his obligation to pay customers their ratable share of customer property is an obligation of federal law: SIPA. SIPA provides no right to contribution, and it is settled in this Circuit that there is no claim for contribution unless the operative federal statute provides one. See Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO, 451 U.S. 77, 97 n.38, 97-99 (1981); see also

27

*Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 144 (2d Cir. 1999) (affirming dismissal of New York state law contribution claims for liability under the Fair Labor Standards Act); *KBL Corp. v. Arnouts*, 646 F. Supp. 2d 335, 341 (S.D.N.Y. 2009) ("[A] plaintiff cannot use New York State common law as an end-around to make a claim for contribution that it could not make under the federal statutory scheme."); *Lehman Bros., Inc. v. Wu*, 294 F. Supp. 2d 504, 505 n.1 (S.D.N.Y. 2003) ("[W]hether contribution is available in connection with a federal statutory scheme is a question governed solely by federal law.") (citation and quotation marks omitted).

Picard emphasizes that he is not seeking contribution for violations of SIPA or any other federal statute, but that is beside the point. "The source of a right of contribution under state law must be *an obligation imposed by state law*." *LNC Invs., Inc. v. First Fid. Bank*, 935 F. Supp. 1333, 1349 (S.D.N.Y. 1996) (emphasis added). The issue is therefore whether the payments made by the Trustee, for which he is seeking contribution, are required by state or federal law--an easy question.

The $800 million paid out to customers fulfilled an obligation created by SIPA, a federal statute that does not provide a right to contribution "either expressly or by clear implication," Texas Industries, Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 638 (1981). Unlike the Bankruptcy Act, SIPA does not require customers to establish a basis of liability as a prerequisite for the Trustee's disbursement obligation. The loss itself is enough. See 15 U.S.C. § 78fff-2(c) (the Trustee "shall allocate customer property of the debtor . . . to customers of such debtor, who shall share ratably in such customer property on the basis and to the extent of their respective net equities"); cf. Hill v. Day (In re Today's Destiny, Inc.), 388 B.R. 737, 753-56 (Bankr. S.D. Tex. 2008) (holding that Texas law governed contribution claim where debtor sought contribution for obligations set forth in proofs of claim alleging fraud under state law). Because the Trustee's payment obligations were imposed by a federal law that does not provide a right to contribution, the district courts properly dismissed these claims.

Having rejected the Trustee's claims asserted on behalf of BLMIS, we consider next whether the Trustee may assert such claims on behalf of BLMIS's customers.  To proceed with these claims, the Trustee must first establish his standing.  This he cannot do.

Standing is a "threshold question in every federal case, determining the power of the court to entertain the suit."  Warth v. Seldin, 422 U.S. 490, 498 (1975).  Standing depends, first, on whether the plaintiff has identified a "case or controversy" between the plaintiff and the defendants within the meaning of Article III of the Constitution.  Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 152 (1970).  "To have standing, '[a] plaintiff must [1] allege personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to be redressed by the requested relief.'"  Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1091 (2d Cir. 1995) (alterations in original) (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)).  In addition, the plaintiff must comply with "prudential" limitations on standing, of which the salient one here is that a party must "assert his own

30

legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties." Warth, 422 U.S. at 499.

We consider below Picard's arguments that: (A) existing Second Circuit precedent allows for third-party standing in a SIPA liquidation; and (B) SIPA itself confers standing, both by creating a bailment relationship between the Trustee and the debtor's customers, and by authorizing SIPC to pursue subrogation claims on customers' behalf.[16]

**A**

The implied prohibition in Article III against third-party standing applies to actions brought by bankruptcy trustees. In Caplin v. Marine Midland Grace Trust Co. of N.Y., 406 U.S. 416 (1972), the Supreme Court ruled that federal bankruptcy law does not empower a trustee to collect money owed to creditors. That is because a bankruptcy trustee is not empowered "to collect money not owed to the estate"; the trustee's proper task "is simply to collect and

---

[16] In proceedings before one of the district courts, the Trustee grounded his standing argument in large part on Section 544(a) of the Bankruptcy Code, which gives a trustee the rights of a hypothetical lien creditor. The court considered this argument at length and ultimately rejected it, see Picard v. JPMorgan Chase & Co., 460 B.R. 84, 92-97 (S.D.N.Y. 2011) (McMahon, J.), and the Trustee has abandoned it on appeal.

reduce to money the property of the estates for which (he is trustee)." Id. at 428-29 (citation and internal quotation marks omitted). "[N]owhere in the statutory scheme is there any suggestion that the trustee in reorganization is to assume the responsibility of suing third parties" on behalf of creditors. Id. at 428. This way, creditors can "make their own assessment of the respective advantages and disadvantages, not only of litigation, but of various theories of litigation," id. at 431; no consensus is needed as to "the amount of damages to seek, or even on the theory on which to sue," id. at 432; and disputes over inconsistent judgments and the scope of settlements can be avoided, id. at 431-32.

Our Court has hewed to this principle. In Wagoner, the misappropriation of funds by the owner and president of the debtor company was facilitated by stock transactions effected through a third-party brokerage firm. Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 117 (2d Cir. 1991). The trustee's claim that the brokerage aided and abetted the fraud was dismissed on summary judgment, and we affirmed, observing that "[i]t is well settled that a bankruptcy trustee has no standing generally to sue third

32

parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." Id. at 118 (citing Caplin, 406 U.S. at 434); see also Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1094 (2d Cir. 1995) (holding that Chapter 11 trustee had no standing to bring creditor claims against accountants and law firms that had provided services to the debtor, a real estate partnership operated as a Ponzi scheme); The Mediators, Inc. v. Manney (In re Mediators, Inc.), 105 F.3d 822, 826 (2d Cir. 1997) (affirming dismissal of breach of fiduciary duty claim brought by creditors' committee functioning as bankruptcy trustee, against bank and law firm for allegedly aiding and abetting debtor's fraud).

The Trustee makes little effort to explain why Caplin and its progeny do not control. Instead, he relies on a single Second Circuit case that was overruled by the Supreme Court, and on dicta in another. Apart from lacking precedential force, both cases are readily distinguishable.

**1**

In Redington v. Touche Ross & Co., 592 F.2d 617 (2d Cir. 1978), rev'd, 442 U.S. 560 (1979), a SIPA trustee sued the accountant of an insolvent brokerage for violations of

33

record-keeping provisions of Section 17(a) of the Securities Exchange Act, as well as violations of state common law. The district court dismissed the Section 17(a) claim for lack of an implied private right of action, and concluded that it lacked jurisdiction over the common law claims. See Redington v. Touche Ross & Co., 428 F. Supp. 483, 492-93 (S.D.N.Y. 1977).

In reversing, we held that Section 17(a) did create an implied private right of action. See Redington v. Touche Ross & Co., 592 F.2d 617 (2d Cir. 1978), rev'd, 442 U.S. 560 (1979). We then considered the trustee's claim that "[h]e is responsible for marshalling and returning [customer] property; to the extent that he is unable to do so, he argues, he may sue on behalf of the customer/bailors any wrongdoer whom they could sue themselves." Id. at 625. Relying on the Federal Rules of Civil Procedure, Redington concluded that "the Trustee, as bailee, is an appropriate real party in interest," id., and that "SIPC is subrogated to the right of action implied in section 17 in favor of brokers' customers against third parties such as accountants." Id. at 624. Redington would favor Picard's case, except that Redington is no longer good law.

34

The Supreme Court granted certiorari in Redington to decide whether Section 17(a) created an implied right of action and whether a SIPA trustee and SIPC had standing to assert that claim. See Touche Ross & Co. v. Redington, 442 U.S. 560 (1979). The Court held that no private right of action existed under Section 17(a), id. at 579, and therefore considered it "unnecessary to reach" the standing issue, id. at 567 n.9. The case was remanded to consider whether an alternative basis for jurisdiction existed, but none was found. See Redington v. Touche Ross & Co., 612 F.2d 68, 70 (2d Cir. 1979).

Picard argues that the Supreme Court left the standing question "untouched" because the opinion was "limited to a merits-based reversal on the issue of whether a private right of action existed under section 17(a)." Appellant Br. 31 (11-5044). However, the question of who may assert a right of action is presented ordinarily only if a right of action has been found to exist. See Nat. R.R. Passenger Corp. v. Nat. Assoc. of R.R. Passengers, 414 U.S. 453, 456 (1974) ("[T]he threshold question clearly is whether the Amtrak Act . . . creates a [private] cause of action . . . for it is only if such a right of action exists that we need

35

consider whether the respondent had standing to bring the action[.]").[17]  The Supreme Court's reversal on the threshold question drained the Second Circuit <u>Redington</u> opinion of force on other questions.  <u>See</u> <u>Newdow v. Rio Linda Union Sch. Dist.</u>, 597 F.3d 1007, 1041 (9th Cir. 2010) ("[W]hen the Supreme Court reverses a lower court's decision on a threshold question," the Court "effectively holds the lower court erred by reaching [other issues].").

Following the Supreme Court's reversal, this Court vacated its original judgment on the ground that subject matter jurisdiction was lacking.  <u>See</u> Order, <u>Redington v. Touche Ross</u>, Nos. 77-7183, 77-7186 (2d Cir. Aug. 8, 1979); Appellee Br. Addendum A (11-5207).  As the Trustee concedes, vacatur dissipates precedential force.  <u>See</u> Appellant Br. 30

---

[17] The Trustee attempts to distinguish <u>National Railroad</u> on the ground that that case involved a single federal statute without additional claims, so a determination that the Amtrak Act did not create a private right of action ended the case.  Because <u>Redington</u> also involved state law claims over which the Court exercised pendent jurisdiction, Picard reasons, "a determination on the existence of a private right of action tied to a federal statute does not end the court's inquiry into a trustee's standing to assert state common law claims."  Appellant Br. 36 (11-5044).  In <u>Redington</u>, however, we did not consider specifically whether the trustee had standing to bring claims under common law.  As explained in text, <u>Redington</u>'s standing analysis was entirely dependent on the Court's antecedent ruling that the statute created an implied private right of action--a ruling that was later overturned.

(11-5044).  See also O'Connor v. Donaldson, 422 U.S. 563, 577 n.12 (1975) (observing that vacatur "deprives [the] court's opinion of precedential effect"); Brown v. Kelly, 609 F.3d 467, 476-77 (2d Cir. 2010).

Since Redington, at least six judges in this Circuit have questioned or rejected third-party claims brought by SIPA trustees, beginning with Judge Pollack in Mishkin v. Peat, Marwick, Mitchell & Co., 744 F. Supp. 531, 556-58 (S.D.N.Y. 1990).[18]  See also Picard v. JPMorgan Chase & Co., 460 B.R. 84, 100-101 (S.D.N.Y. 2011) (McMahon, J.); Picard v. HSBC Bank PLC, 454 B.R. 25, 33-34 (S.D.N.Y. 2011) (Rakoff, J.); Picard v. Taylor (In re Park South Sec., LLC), 326 B.R. 505, 516 (Bankr. S.D.N.Y. 2005) (Drain, J.); Giddens v. D.H. Blair & Co. (In re A.R. Baron & Co., Inc.), 280 B.R. 794, 804 (Bankr. S.D.N.Y. 2002) (Beatty, J.); SIPC v. BDO Seidman, LLP, 49 F. Supp. 2d 644, 653 (S.D.N.Y. 1999) (Preska, J.), rev'd on other grounds, 222 F.3d 63 (2d Cir. 2000).

---

[18] In a hearing in the Mishkin case, Judge Pollack concluded, as we do, that Redington "was reversed in all respects not on other grounds" and "does not stand as the law of this circuit."  SPA 17 (11-5175).

37

Yet Redington has enjoyed something of a half-life, with several courts (including this one) assuming without deciding that Redington retains residual force.[19]  Redington should be put to rest; it has no precedential effect.

Even if Redington retained some persuasive value, it would not decide this case.  First, Redington considered chiefly whether the trustee and SIPC had standing to bring a cause of action under Section 17 of the Exchange Act; the opinion said nothing about a SIPA trustee's ability to orchestrate mass tort actions against third parties.  See Redington v. Touche Ross & Co., 592 F.2d 617, 618 (2d Cir. 1978), rev'd, 442 U.S. 560 (1979) ("[W]e are presented with the question whether a private cause of action exists under section 17 of the Securities Exchange Act of 1934 against

---

[19] Assuming that Redington was still good law, Judges Drain and Beatty instead rejected SIPA trustees' standing arguments on the ground that only SIPC, not a SIPA trustee, could enforce its rights of subrogation.  See In re Park South Sec., LLC, 326 B.R. at 516; In re A.R. Baron & Co., Inc., 280 B.R. at 804.  In BDO Seidman, LLP, Judge Preska held that although Mishkin's interpretation of SIPC's subrogation power was "more faithful to the letter and purpose of the Act," she was nonetheless "bound by Redington to find that SIPC has standing to bring suit."  49 F. Supp. 2d at 653.  On appeal, this Court "assume[d], without deciding, that . . . SIPC has standing as the customers' subrogee," SIPC v. BDO Seidman, LLP, 222 F.3d 63, 69 (2d Cir. 2000), and ultimately dismissed its claims on substantive grounds, id. at 71-76.

38

accountants who prepare misleading statements of a broker's financial affairs, and if so, who may maintain such an action."). Second, our holding in Redington turned, in part, on an analysis of Fed. R. Civ. P. 17(a), which sets forth rules concerning real parties in interest, and which has no application here. See id. at 625; see also infra p. 51 n.25. Third, Redington involved claims against a single accounting firm for a few discrete instances of alleged misconduct (the preparation of misleading financial statements). As a result, the policy concerns we express below (see infra pp. 59-69) would have been considerably diminished--and, indeed, were not even addressed by the Court. Fourth, and finally, in Redington the brokerage firm was not complicit in the wrongdoing, but rather "an entity distinct from its conniving officers [that] was directly damaged by Touche Ross' unsatisfactory audit." 592 F.2d at 620. The Redington Court therefore did not have occasion to consider whether the doctrine of in pari delicto barred all or part of the suit. In sum, Redington is both non-binding and inapposite.

The Trustee relies on <u>St. Paul Fire & Marine Insurance Co. v. PepsiCo, Inc.</u>, 884 F.2d 688 (2d Cir. 1989), for the proposition that a trustee may assert creditors' claims if they are generalized in nature, and not particular to any individual creditor.  However, the holding of that case has no application here.

PepsiCo had been guarantor of bonds issued by a subsidiary that later was acquired by a subsidiary of Banner Industries.  When the (later) merged entity defaulted on the bonds, PepsiCo sued Banner, alleging diversion of assets and alter ego.  The merged entity went bankrupt, and the trustee sued Banner for misappropriation.  We ruled that the trustee--and not PepsiCo--could pursue Banner because Ohio law allowed a subsidiary to assert an alter ego claim against its parent, so that "[t]he cause of action therefore becomes property of the estate of a bankrupt subsidiary, and is properly asserted by the trustee in bankruptcy."  <u>Id.</u> at 703-04.

Picard directs us to a passage in <u>St. Paul</u>--stating that a trustee may bring a claim if the "claim is a general one, with no particularized injury arising from it, and if

that claim could be brought by any creditor of the debtor," id. at 701--and contends that the third-party claims here are common to all customers because all customers were similarly injured by Madoff's fraud and the Defendants' facilitation.  This argument is flawed on many levels:

• St. Paul decided the "specific question" whether a creditor may bring an alter ego claim against the debtor's parent when the debtor itself also possesses such a claim. Id. at 699.  But Picard seeks to assert claims that are property only of the creditors, not of the debtor.

• The Trustee's broad reading of St. Paul would bring the Court's holding into conflict with a line of cases that came before and after it.  As discussed supra pp. 32-34, it is settled that a trustee may not assert creditors' claims against third parties.  See, e.g., Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114 (2d Cir. 1991).  And, of course, St. Paul could not alter the Supreme Court's ruling in Caplin.  Picard's argument thus conflicts with Supreme Court and Second Circuit precedent.  See generally In re Stanwich Fin. Servs. Corp., 317 B.R. 224, 228 n.4 (Bankr. D. Conn. 2004) (highlighting this tension).

41

• The language cited by Picard from St. Paul is not a pronouncement about third-party standing; it voices the maxim that only a trustee, not creditors, may assert claims that belong to the bankrupt estate. As St. Paul elsewhere states: "'[T]he Trustee in bankruptcy has standing to represent only the interests of the debtor corporation.' Our decision today goes no further than to say that causes of action that could be asserted by the debtor are property of the estate and should be asserted by the trustee." St. Paul, 884 F.2d at 702 n.3 (internal citation omitted) (quoting Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 62 n.4 (2d Cir. 1985)). As illustrated by St. Paul, when a creditor seeks relief against third parties that pushed the debtor into bankruptcy, the creditor is asserting a derivative claim that arises from harm done to the estate. Judge Posner described this distinction:

> The point is simply that the trustee is confined to enforcing entitlements of the corporation. He has no right to enforce entitlements of a creditor. He represents the unsecured creditors of the corporation; and in that sense when he is suing on behalf of the corporation he is really suing on behalf of the creditors of the corporation. But there is a difference between a creditor's interest in the claims of the corporation against a third party, which are enforced by the trustee, and the creditor's own direct--not derivative--claim against the third

42

> party, which only the creditor himself can enforce.

Steinberg v. Buczynski, 40 F.3d 890, 893 (7th Cir. 1994).

See generally Prod. Res. Grp., L.L.C. v. NCT Grp., Inc., 863 A.2d 772, 792 (Del. Ch. 2004).

• The customers' claims against the Defendants are not "common" or "general." A debtor's claim against a third party is "general" if it seeks to augment the fund of customer property and thus affects all creditors in the same way. Picard, however, seeks to assert claims on behalf of thousands of customers against third-party financial institutions for their handling of individual investments made on various dates in varying amounts. The Defendants' alleged wrongful acts, then, could not have harmed all customers in the same way.[20]

---

[20] A recent case arising out of the BLMIS bankruptcy provides a useful contrast. In Fox v. Picard (In re Madoff), 848 F. Supp. 2d 469 (S.D.N.Y. 2012), the district court relied on St. Paul in holding that certain Madoff customers could not pursue fraudulent transfer claims "that were the property of the BLMIS estate." Id. at 478. The customer claims were "duplicative and derivative of the Trustee's fraudulent transfer claim." Id. at 479 n.2. Accordingly, the court found the claims to be "general" in the sense articulated in St. Paul, in that they arose from "a single set of actions that harmed BLMIS and all BLMIS customers in the same way." Id. at 480. Here, however, the customers' claims are not derivative of claims held by the BLMIS estate.

43

**B**

The Trustee attempts to blunt the force of <u>Caplin</u> and its progeny by arguing that a SIPA liquidation is unique and is therefore not controlled by precedent under the bankruptcy code.  He advances two theories for why a SIPA trustee enjoys standing to assert third-party claims.

**1**

Picard contends that, for SIPA purposes, the customers of a failed brokerage are bailors, and that he--acting as bailee--"has a sufficient possessory interest to permit him to 'recover for the wrongful act of a third party resulting in the loss of, or injury to, the subject of the bailment.'" <u>United States v. Perea</u>, 986 F.2d 633, 640 (2d Cir. 1993) (quoting <u>Rogers v. Atl., Gulf & Pac. Co.</u>, 107 N.E. 661, 664 (N.Y. 1915)).  We disagree.

First, the statute is not written or cast in terms of bailment.  "To the extent consistent with the provisions of this chapter, a liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under [the Bankruptcy Code]."  15 U.S.C. § 78fff(b).  As a general rule, SIPA vests trustees with "the same powers and title with respect to the debtor and the property of the debtor

44

. . . as a trustee in a case under Title 11."  15 U.S.C. § 78fff-1(a).  True, a SIPA trustee has some powers not conferred on a trustee under Title 11.  Most notably, SIPA creates a fund of customer property that is separate from the debtor estate and that has priority over other creditors' claims, and authorizes the trustee to ratably distribute those funds based on customers' net equity.  See 15 U.S.C. § 78fff-2(c)(1)(B); In re Bernard L. Madoff Investment Secs., 654 F.3d 229, 231 (2d Cir. 2011), cert. denied, 133 S. Ct. 25 (2012).  But the statute does not confer upon SIPA trustees a power, denied all other bankruptcy trustees, to sue third parties on claims that belong to persons other than the estate.  Nowhere does the statute reference bailment, or characterize customers as "bailors" or trustees as "bailees," or in any way indicate that the trustee is acting as bailee of customer property.

Picard alternatively invokes the principle of bailment under the common law.  This is dubious: courts are careful to avoid overlaying common law principles onto a statutory framework, even when (unlike here) the statute makes clear reference to common law.  See Moore v. PaineWebber, Inc., 189 F.3d 165, 179-80 (2d Cir. 1999) ("That the statute . . .

45

borrow[s] in part from the common law should not mislead us: it remains the statute and its purpose that governs."). This caution is especially apt here because the statute creates a ramified scheme that makes no mention of common law.

In any event, the analogy to the common law of bailment is flawed from start to finish. A bailment is "a delivery of personalty for some particular purpose, or on mere deposit, upon a contract express or implied, that after the purpose has been fulfilled it will be redelivered to the person who delivered it, or otherwise dealt with according to that person's directions, or kept until it is reclaimed." 9 N.Y. Jur. 2d Bailments and Chattel Leases § 1 (West 2013). Even assuming that the customers' investments could be deemed bailed property, the only delivery that took place was when customers made their investments, either in BLMIS directly, or through the feeder funds. See Pattison v. Hammerstein, 39 N.Y.S. 1039, 1040 (App. Div. 1st Dep't 1896); see also United States v. $79,000 in Account No. 2168050/6749900 at Bank of N.Y., 96 CIV. 3493 (MBM), 1996 WL 648934, at *6 (S.D.N.Y. Nov. 7, 1996) ("Delivery to the bailee is required to create a bailment."). So: any

supposed bailment pre-dated Picard's appointment; he was not entrusted with any customer property until *after* it had been impaired; and he never had control over the missing funds that he now seeks to recoup. He therefore is not the proper party to bring such an action. See 9 N.Y. Jur. 2d Bailments and Chattel Leases § 115 (West 2013) (explaining that bailee may only "bring an action to recover for the loss of or injury to the bailed property while in his or her possession").[21]

Moreover, Picard is not seeking to recover specific bailments for return to individual bailors. See 9 N.Y. Jur. 2d Bailments and Chattel Leases § 82 (West 2013) ("One of the most important rights of the bailor is that, on the termination of the bailment, the bailor will return to him or her the identical thing bailed . . . ."). Unlike "customer name securities," which are separately held and returned to individual customers outside the normal distribution scheme,[22] Picard's claims are intended to

---

[21] Judge McMahon likened the Trustee's position to that of a parking garage attendant who is handed the keys to a car that was recently in an accident and decides to sue the culpable party on the owner's behalf. See Picard v. JPMorgan Chase & Co., 460 B.R. 84, 104-05 (S.D.N.Y. 2011).

[22] See 15 U.S.C. § 78*lll*(4) (excluding "customer name securities delivered to the customer" from definition of

47

augment the general fund of customer property so that it can be distributed ratably based on customers' net equity. This arrangement is not an analog to a bailment, in which the bailee is entrusted with an item that is to be recovered by the bailor at some later time.

SIPC urges that we view the transaction as though BLMIS, not the Trustee, acted as the bailee of customer property, and that the Trustee is simply acting on BLMIS's behalf to recover the bailed property. The short answer is that Madoff (and, by extension, BLMIS) took the investment money from the customers in order to defraud them--and a thief is not a bailee of stolen property. See Pivar v. Graduate Sch. of Figurative Art of the N.Y. Acad. of Art, 735 N.Y.S. 2d 522, 522 (App. Div. 1st Dep't 2002) (holding that a bailment relationship arises if the bailee takes

---

customer property); see also In re New Times Sec. Servs., Inc., 371 F.3d 68, 72-73 (2d Cir. 2004). This contrast, and its ramifications, are illuminated by SIPC's own statements to Congress regarding the passage of the 1978 amendments to SIPA. SIPC's then-Chairman, Hugh F. Owens, explained that customer name securities "will be treated, in short, as though they are not part of the debtor's estate, but merely held by the debtor as bailee"--implying that most other commingled property, such as cash, would simply become part of the debtor's estate. SIPA Amendments: Hearings on H.R. 8331 Before the Subcomm. on Sec., Comm. on Banking, Hous. and Urban Affairs, 95th Cong. 41-42 (1978) (Statement by Hugh F. Owens, Chairman of SIPC).

"lawful possession" of property "without present intent to appropriate").

Madoff's commingling of customer funds also defeats any analogy to bailment. Notwithstanding Madoff's pretense, he failed to maintain customers' investments in separate named accounts. He deposited all customer funds into a general account (the 703 Account) and distributed those new investments to earlier customers in lieu of actual returns. This arrangement, which enabled the fraud, made a bailment impossible. See Peoples Westchester Sav. Bank v. F.D.I.C., 961 F.2d 327, 330 (2d Cir. 1992) (distinguishing special accounts from general accounts); see also United States v. Khan, No. 97-6083, 1997 WL 701366, at *2 (2d Cir. 1997) (holding that a deposit into a general bank account "destroys a potential bailment" under New York law).[23]

---

[23] "With a few exceptions, such as commingled fungible goods in a warehouse, the general rule is that the bailee can only discharge his or her liability to the bailor by returning the identical thing received, in its original or an altered form, according to the terms of the bailment." 9 N.Y. Jur. 2d Bailments and Chattel Leases § 84 (West 2013). Rahilly v. Wilson, a case relied on by SIPC, is not to the contrary. See Rahilly v. Wilson, 20 F. Cas. 179, 182 (Cir. Ct. D. Minn. 1873) (comparing commingled bales of wheat to "an ordinary general deposit of money in a bank" and holding that no bailment had taken place).

49

SIPC attempts to obviate these difficulties by relying on SEC Rule 15c, which establishes bookkeeping segregation requirements for brokers. 17 C.F.R. § 240.15c3-3. Judge Rakoff was "mystified" by this argument, Picard v. HSBC Bank PLC, 454 B.R. 25, 32 (S.D.N.Y. 2011), as are we.

Rule 15c requires brokers to maintain a minimum cash balance in a reserve account and segregate all such cash for customers' benefit. See 17 C.F.R. § 240.15c3-3. It also "specifically contemplates the commingling of customer monies and the lending of customer securities." Levitin v. PaineWebber, Inc., 159 F.3d 698, 706 (2d Cir. 1998). Whatever Rule 15c may do, it does not confer power on a SIPA trustee to sue on behalf of customers. First, the Rule is not a part of SIPA. Second, such a rule would exceed the scope of agency rule-making. See generally Alexander v. Sandoval, 532 U.S. 275, 291 (2001) ("Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not."). In any event, the Rule does not suggest that the broker (or the Trustee) serves as a bailee of customer property, or that the Trustee may assert claims on behalf of customers.

Finally, SIPC and the Trustee infer a bailment relationship from federal common law and the Federal Rules of Civil Procedure. The inferences are strained at best. Federal common law, which does not speak to the powers of a SIPA trustee, offers no useful insight.[24] Nor do the Federal Rules of Civil Procedure.[25]

**2**

The Trustee argues that, because SIPC advanced funds to customers at the outset of the liquidation, SIPC is

---

[24] SIPC suggests that it is appropriate to resort to federal common law where a significant conflict exists between state and federal law and where the need for uniformity in the treatment of brokerage customers is paramount. But no legal authority is offered to support the application of federal common law here. And there is no evident conflict between New York bailment law (on the one hand) and (on the other) SIPA, Rule 15c, or some broader federal policy.

[25] The Trustee invokes Rule 17, which allows a bailee to sue "in [his] own name[] without joining the person for whose benefit the action is brought." Fed. R. Civ. P. 17(a)(1). But, as discussed in text, the trustee is not a bailee. Additionally, Rule 17(a), like all rules prescribed by the Supreme Court, may not abridge, enlarge, or otherwise modify substantive rights. See 28 U.S.C. § 2072(b); Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber, 407 F.3d 34, 49 (2d Cir. 2005) ("The procedural mechanisms set forth in Rule 17(a) for ameliorating real party in interest problems may not . . . be employed to expand substantive rights."). It therefore cannot provide an independent basis for standing. See generally Natural Res. Def. Council, Inc. v. EPA, 481 F.2d 116, 121 (10th Cir. 1973).

subrogated to those customers' claims against the Defendants; SIPC therefore may assert those claims as subrogee; and Picard is authorized to enforce that right on SIPC's behalf.  But SIPC is a creature of statute, and neither the plain language of the statute, nor its legislative history, supports the Trustee's position.

True, a SIPA trustee (unlike a trustee in bankruptcy), advances money to pay claims.  The statute takes this fact into account by subrogating SIPC to customers' net equity claims to the extent of the advances they received.  But it goes no further.

The Trustee's subrogation theory is premised in § 78fff-3(a):

> To the extent moneys are advanced by SIPC to the trustee to pay or otherwise satisfy the claims of customers, in addition to all other rights it may have at law or in equity, SIPC shall be subrogated to the claims of such customers with the rights and priorities provided in this chapter, except that SIPC as subrogee may assert no claim against customer property until after the allocation thereof to customers as provided in section 78fff-2(c) of this title.

15 U.S.C. § 78fff-3(a).  It is undisputed that the phrase "claims of customers" refers (as throughout the statute) to customers' net equity claims against the estate.  See generally In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d

52

229, 233 (2d Cir. 2011), cert. denied, 133 S. Ct. 25 (2012). SIPA thus allows only a narrow right of subrogation--for SIPC to assert claims against the fund of customer property and thereby recoup any funds advanced to customers once the SIPA trustee has satisfied those customers' net equity claims.

The Trustee urges us to conclude that § 78fff-3(a) does more--much more--by creating a right of subrogation that allows SIPC (and, by extension, the Trustee) to step into customers' shoes and to initiate and control litigation on their behalf, against any number of defendants, until SIPC has been repaid in full. As we emphasized earlier, SIPA grants trustees the "same powers and title with respect to the debtor and the property of the debtor" as a Title 11 trustee, 15 U.S.C. § 78fff-1(a), and the Supreme Court has squarely rejected attempts by Title 11 trustees to capture such litigation, see Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 428 (1972). As a final resort, the Trustee relies on a catch-all provision included in the 1978 amendments to SIPA, which states that the subrogation rights afforded by § 78fff-3(a) should not be read to diminish "all other rights [SIPC] may have at law or in equity." 15

53

U.S.C. § 78fff-3(a).  From here, the Trustee claims an implied right of equitable subrogation, "the principle by which an insurer, having paid losses of its insured, is placed in the position of its insured so that it may recover from the third party legally responsible for the loss." Winkelmann v. Excelsior Ins. Co., 650 N.E.2d 841, 843 (N.Y. 1995).  He thus claims a wide grant of authority to initiate class-action lawsuits and assert any number of tort claims against third parties on customers' behalf.[26]  This is a long, long reach.

There is no sign that Congress intended an expansive increment of power to SIPA trustees.  In 1973, the SIPC chairman appointed a Special Task Force to consider possible amendments to the 1970 Act.  The resulting July 1974 report separately listed its "major policy recommendations" and its proposed "technical refinements."  See Report to the Board of Directors of SIPC of the Special Task Force to Consider Possible Amendments to SIPA, Letter of Transmittal (July 31, 1974).  Recommendation II.A.9, deemed a "Major Policy Recommendation," states that "claims of SIPC as subrogee (except as otherwise provided), should be allowable *only as*

---

[26] We use the term "class-action lawsuits" loosely here, without taking a position on the SLUSA question.

*claims against the general estate*."  Id. at 12 (emphasis added); see also SIPA Amendments of 1975: Hearings on H.R. 8064 Before the Subcomm. on Consumer Protection and Fin. of the H. Comm. on Interstate and Foreign Commerce, 94th Cong. 64 (1976) (hereinafter "Hearings on H.R. 8064").

Notably, Caplin was decided in 1972, before the Task Force report and six years before Congress amended § 78fff-3(a) to include "all other rights [SIPC] may have at law or in equity."  If Congress sought to exempt SIPA trustees from Caplin's rule and expand SIPC's subrogation rights to tort actions against third parties, we would expect such intent to be manifested in the statutory wording and in the record.[27]

The wording cited by Picard was proposed by SIPC itself as a "Minor Substantive or Technical Amendment[]" in order to "make clear that SIPC's subrogation rights under the 1970 Act are cumulative with whatever rights it may have under other State or Federal laws."  Hearings on H.R. 8064, 94th

_____

[27] Caplin was undoubtedly on the radar of legislators at the time, as an earlier version of Section 544 of the Bankruptcy Code introduced with the 1978 amendments contained a provision intended to overrule Caplin.  See In re Ozark Rest. Equip. Co., Inc., 816 F.2d 1222, 1227 n.9 (8th Cir. 1987).  Significantly, this provision was deleted prior to enactment.  Id.

55

Cong. 197, 199 (1976) (Memorandum of the Securities Investor Protection Corporation in Regard to Certain Comments Concerning H.R. 8064). Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions--it does not . . . hide elephants in mouseholes." Whitman v. Am. Trucking Assocs., Inc., 531 U.S. 457, 468 (2001).

The Trustee adduces rules of insurance law to justify his claim, an analogy with some intuitive appeal: Principles of equity generally permit subrogees wide scope to sue third-party tortfeasors, a claim that arises most commonly with insurance. See, e.g., Winkelmann, 650 N.E.2d at 843.

But this argument succumbs to the same critique as Picard's bailment theory: We avoid engrafting common law principles onto a statutory scheme unless Congress's intent is manifest. See supra p. 46. The clearest Congressional intent here is that we should treat SIPA as a bankruptcy statute, not as an insurance scheme. "SIPA and FDIA are independent statutory schemes, enacted to serve the unique needs of the banking and securities industries, respectively."[28] SIPC v. Morgan, Kennedy & Co., 533 F.2d

---

[28] Congress rejected some early versions of the SIPA bill "which were patterned on FDIA and which extended

56

1314, 1318 (2d Cir. 1976). We have since warned against oversimplified comparisons between insurance law and federal statutory law: "While this Court has referred to SIPC as providing a form of public insurance, it is clear that the obligations imposed on an insurance provider under state law do *not* apply to this congressionally-created nonprofit membership corporation." In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d 229, 239 (2d Cir. 2011), cert. denied, 133 S. Ct. 25 (2012) (internal citations and quotation marks omitted).

Relatedly, Picard argues under principles of equity that unless he can spearhead the litigation on behalf of defrauded customers, the victims will not be made whole, SIPC will be unable to recoup its advances, and third-party tortfeasors will reap windfalls.[29] No doubt, there are

_____

insurance coverage to certain beneficial interests represented by customer accounts." Morgan, Kennedy & Co., 533 F.2d at 1318.

[29] Picard and SIPC contend that, absent his exclusive authority to bring these customer claims, the Defendants would in effect be immunized from suit. But it is not obvious why customers cannot bring their own suits against the Defendants. In fact, the Defendants make clear that customers have already filed such actions. See, e.g., MLSMK Inv. Co. v. JP Morgan Chase & Co., 431 F. App'x 17 (2d Cir. 2011) (summary order); Shapiro v. JP Morgan Chase & Co., No. 11-CV-8331 (S.D.N.Y.); Hill v. JPMorgan Chase & Co., No. 11-CV-7961 (S.D.N.Y.). As in Redington, "the customers on whose behalf the Trustee seeks to maintain suit are not only

57

advantages to the course Picard wants to follow.  But equity has its limits; it may fill certain gaps in a statute, but it should not be used to enlarge substantive rights and powers.  Cf. In re Ozark, 816 F.2d at 1230 (observing that while Bankruptcy Code allows a court to apply equitable principles when necessary, "[t]hese powers . . . do not include the ability to award equitable relief where the party asserting the cause of action for such relief does not have standing under any other section of the Code").

As the Supreme Court observed, "SIPC's theory of subrogation is fraught with unanswered questions."  Holmes v. SIPC, 503 U.S. 258, 270 (1992) (ultimately declining to decide subrogation issue and instead holding that link between stock manipulation and harm to customers was too remote to support SIPC's RICO claim).  As in Holmes, SIPC has left courts "to guess at the nature of the 'common law rights of subrogation' that it claims."  Id. at 271.

The practical skepticism voiced in Caplin in a traditional bankruptcy context is justified here as well. Would such suits prevent customers from "mak[ing] their own

---

entitled to bring, but have already initiated their own action."  Redington v. Touche Ross & Co., 592 F.2d 617, 635 (2d Cir. 1978) (Mulligan, J., dissenting).

assessment of the respective advantages and disadvantages, not only of litigation, but of various theories of litigation"? Caplin, 406 U.S. at 431. Can a SIPA trustee control customers' claims against third parties if SIPC has not fully satisfied the customers' claims against the estate? How would inconsistent judgments be avoided, given that "independent actions are still likely because it is extremely doubtful that [the parties] would agree on the amount of damages to seek, or even on the theory on which to sue"? Id. at 432. Who would be bound by a settlement entered into by either the Trustee or by each customer who brings suit? Id. The size and scope of the litigation here only amplify these concerns.

As Caplin advises, it is better to leave these intractable policy judgments to Congress:

> Congress might well decide that reorganizations have not fared badly in the 34 years since Chapter X was enacted and that the status quo is preferable to inviting new problems by making changes in the system. Or, Congress could determine that the trustee . . . was so well situated for bringing suits . . . that he should be permitted to do so. In this event, Congress might also determine that the trustee's action was exclusive, or that it should be brought as a class action on behalf of all [creditors], or perhaps even that the [creditors] should have the option of suing on their own or having the trustee sue on their behalf. Any number of alternatives are

59

available.  Congress would also be able to answer questions regarding subrogation or timing of law suits before these questions arise in the context of litigation.  Whatever the decision, it is one that only Congress can make.

Caplin, 406 U.S. at 434-35.

*   *   *

For the foregoing reasons, the judgments are affirmed.